**Donald H. LOUDON, Jr., Plaintiff Below, Appellant,**

v.

**ARCHER–DANIELS–MIDLAND COMPANY, Dwayne O. Andreas, Michael D. Andreas, Lowell W. Andreas, Martin L. Andreas, Ralph Bruce, John H. Daniels, H.D. Hale, John K. Vanier, M. Brian Mulroney, Marguaritta Rockefeller, James R. Randall, O. Glenn Webb, F. Ross Johnson, Shreve M. Archer, Jr., Ray A. Goldberg, Robert S. Strauss, and Gaylord O. Coan, Defendants Below, Appellees.**

**No. 88, 1996.**

Supreme Court of Delaware.

Submitted: June 17, 1997.*

Decided: Sept. 17, 1997.

Revised: Sept. 18, 1997.

---

\* This matter was argued before the Court *en Banc* on June 4, 1996. Shortly thereafter, these proceedings were stayed pending the outcome of a related proceeding in the United States Court of Appeals for the Seventh Circuit. *Loudon v. Archer–Daniels–Midland Co.*, Del.Supr., No. 88, 1996, Veasey, C.J. (July 19, 1996) (Order). The Seventh Circuit dismissed the federal action as moot

on April 14, 1997. *See* n. 18 *infra*. After further briefing herein, the stay was lifted and the matter was submitted to this Court for decision as of June 17, 1997. *Loudon v. Archer–Daniels–Midland Co.*, Del.Supr., No. 88, 1996, Veasey, C.J. (June 13, 1997) (Order).

William Prickett (argued), Ronald A. Brown, Jr., of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington; Arthur T. Susman, Terrence Buehler, Robert E. Williams, of Susman, Buehler & Watkins, of counsel, Chicago, IL, for Appellant.

R. Franklin Balotti, Todd C. Schiltz, Richards, Layton & Finger, Wilmington, for Appellee Archer Daniels Midland Company.

Lawrence C. Ashby, Amy A. Quinlan, of Ashby & Geddes, Wilmington; Aubrey M. Daniel, III, Nancy F. Lesser (argued), George A. Borden, of counsel, Williams & Connolly, Washington, DC, for Individual Defendants–Appellees.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT and BERGER, JJ., constituting the Court en Banc.

VEASEY, Chief Justice:

In this appeal we affirm the judgment of the Court of Chancery dismissing a complaint in a stockholder suit challenging the disclosures in a proxy statement for the 1995 annual meeting to elect directors. The terms of the directors elected at that meeting have come and gone, but the issues we address now relate to the availability of a damages remedy arising out of the allegedly defective proxy statement.

In agreeing with the Court of Chancery that this complaint does not state a claim upon which relief can be granted, we recognize that the Delaware law of the fiduciary duties of directors, as developed in our judicial decisions, establishes a general duty of directors to disclose to stockholders all material information reasonably available when seeking stockholder action. Whether or not a failure to fulfill that duty will result in personal liability for damages against di-

rectors depends upon the nature of the stockholder action that was the object of the solicitation of stockholder votes and the misstated or omitted disclosures in connection with that solicitation.

A timely complaint, properly pleaded and supported by proof sufficient to invoke preliminary equitable relief, could result in an early injunction or the imposition of corrective disclosures before the complained-of corporate activity had been consummated. There may also be a potential damage remedy where the misstatement or omission implicates the stockholders' economic or voting rights. But there is no *per se* doctrine imposing damage liability on directors in a disclosure case absent these elements. Since the claim here, as presently pleaded, does not set forth circumstances that would warrant an award of damages, it is subject to dismissal.

Although we affirm the judgment of the Court of Chancery, we will, because of the unique circumstances of this case, remand for the sole purpose of allowing plaintiff a reasonable opportunity to state a claim consistent with this opinion.

### Facts

The following facts are derived from the complaint dismissed by the Court of Chancery for failure to state a claim upon which relief can be granted under Court of Chancery Rule 12(b)(6).

The defendant below-appellee, Archer Daniels Midland Co. (ADM), portrays itself as "the supermarket to the world." It is a publicly held Delaware corporation engaged in the business of procuring, storing, transporting and merchandising agricultural commodities and products. The named individual defendants were the members of ADM's

Board of Directors in 1995.[1] Plaintiff Loudon is now, and at all relevant times has been, a stockholder of ADM and was therefore entitled to vote in the uncontested 1995 directorial election. Plaintiff originally brought this action as an individual and putative class action seeking to overturn that election. That issue is now moot. But since plaintiff also seeks monetary damages against the defendant directors, we focus on that issue, which is not moot.

The events giving rise to this litigation stem from a series of allegations of wrongdoing. On June 28, 1995, ADM announced in a press release that it was the subject of a federal criminal investigation into possible antitrust violations. This investigation had focused primarily on ADM's activities in the food additives industry, particularly the company's sales of citric acid, lycine and high fructose corn syrup. In July of 1995, it was disclosed that Mark E. Whitacre (then president of ADM's BioProducts division) had been acting at the behest of the Federal Bureau of Investigation (FBI), covertly videotaping and sound recording various ADM meetings and conferences. The FBI investigation, with the assistance of Whitacre's espionage, allegedly revealed an extensive pattern of market manipulation and price-fixing engaged in by certain employees and senior executives of ADM.

On July 19, 1995, ADM issued a press release announcing that it had formed a Special Litigation Committee to oversee the Company's response to the federal investigation and various lawsuits that had been filed in response thereto. The release disclosed the Board's election of Gaylord O. Coan to the ADM Board. The release made no mention, however, of the resignation of Howard M. Buffet, whom Coan replaced on the Board and on the management slate presented to

1. The ADM Board of Directors consists of the following individuals: Dwayne O. Andreas, ADM's Chief Executive Officer and Chairman of the ADM Board; Michael D. Andreas, vice chairman of the ADM Board; Lowell W. Andreas, a retired president of ADM; Martin L. Andreas, ADM's senior vice president; H.D. Hale, Chairman of the Board and CEO of ADM Milling Co., an ADM subsidiary; James R. Randall, ADM's President; Ralph Bruce, a retired executive vice president of ADM; John H. Daniels, a retired chairman of ADM; John K. Vanier; M. Brian Mulroney; Marguaritta Rockefeller; O. Glenn Webb; F. Ross Johnson; Shreve M. Archer, Jr.; Ray A. Goldberg; Robert S. Strauss; and Gaylord O. Coan. All of the aforementioned directors are named defendants in this lawsuit. As discussed *infra*, Gaylord O. Coan replaced former ADM director Howard M. Buffet who resigned shortly before the proxy statement was issued for ADM's 1995 Annual Meeting.

the stockholders for election. Prior to his resignation, Mr. Buffet had been an employee of the company as well as a director, having served as a corporate vice president, assistant to ADM Chairman Andreas, and ADM's corporate spokesperson.

On August 7, 1995, ADM fired Mr. Whitacre and publicly announced that he had misappropriated some $2.5 million while acting as an FBI operative. Mr. Whitacre has repeatedly professed his innocence and continues to claim that the $2.5 million was a portion of the purported $6 million in improper bonuses paid by ADM to its officers and directors. On September 13, 1995, while addressing the Emory University Business School, ADM director F. Ross Johnson commented on the FBI's investigation, the activities of the Committee and the termination of Whitacre. Mr. Johnson's comments reflected a general distaste for the FBI and expressed uncertainty about the future course of ADM's antitrust and civil litigation difficulties.

Also on September 13, 1995, ADM issued its Proxy Statement in connection with the company's upcoming Annual Stockholder Meeting. The Proxy Statement contained disclosures concerning: (1) the FBI antitrust investigation; (2) the existence of certain class actions and derivative suits naming various corporate insiders as defendants; and (3) the existence of the Special Litigation Committee. Like the July 19, 1995 press release, the Proxy Statement made no mention of the circumstances surrounding the resignation of former ADM director Howard M. Buffet and the replacement of Mr. Buffet by Mr. Coan on the Board.

On October 19, 1995, ADM held its annual meeting. ADM's proposed slate of directors ran unopposed and was overwhelmingly re-elected. According to the complaint, Dwayne Andreas presided over the meeting in an extremely autocratic and domineering manner. Mr. Andreas refused to allow stockholders to ask questions and abruptly dismissed any efforts by stockholders to comment or question the current affairs of ADM.

When one stockholder persisted in his efforts to comment on ADM policy, Mr. Andreas directed that the stockholder's microphone be turned off.

### Disposition in the Court of Chancery

On October 20, 1995, the day immediately following the annual meeting, plaintiff filed this action in the Court of Chancery. The complaint is based on alleged breaches of the directors' fiduciary duty of disclosure in connection with the solicitation of proxies for the election. Plaintiff also seeks damages.

The complaint contended that the ADM Board had failed to disclose or had misstated the following, allegedly material facts: (1) certain statements made by ADM director, Johnson, in his speech before the Emory University Business School concerning the status of the federal antitrust investigation and related matters; (2) the resignation of ADM director Buffet and the reasons advanced by Mr. Buffet for tendering that resignation; (3) details concerning the selection of members to serve on the Special Litigation Committee and the specific mandate of the Committee; (4) the details of Michael Andreas' involvement in alleged price-fixing and other illegal activities and whether or not videotape or other evidence existed to substantiate those allegations; (5) whether or not James R. Randall and other ADM directors approved the distribution of bonuses to ADM insiders based on the use of false invoices; and (6) other material facts concerning "the Board's conflicts of interest and lack of independence."

Based on the preceding claims, the complaint sought to unseat the purportedly elected Board, pursuant to both 8 *Del.C.* § 225 and the Court of Chancery's general equity jurisdiction. The complaint also seeks damages against the directors. The Court of Chancery granted ADM's motion pursuant to Court of Chancery Rule 12(b)(6) and dismissed all of plaintiffs' claims for failure to state a claim upon which relief can be granted.[2] First, the Court of Chancery held that the claims could not properly be considered

---

**2.** *Loudon v. Archer–Daniels–Midland Co.,* Del. Ch., C.A. No. 14638, 1996 WL 74730, mem. op.

(Feb. 20, 1996) ("Mem.Op.")

under the framework of 8 *Del.C.* § 225. The court then concluded that equitable relief was also unavailable because disclosure of the facts enumerated in the complaint was either unnecessary (*i.e.*, the facts were immaterial) or would amount to self-flagellation. From this dismissal, plaintiff appeals.[3]

### The Proper Pleading Standard

Plaintiff contends that the trial court erred by imposing an unduly severe pleading requirement, thereby erecting an unwarranted hurdle for plaintiff to overcome. In particular, plaintiff points to language in the trial court's opinion stating that "plaintiff has the burden to plead specific facts sufficient to state an actionable disclosure claim" and requiring that the plaintiff's complaint contain "particularization of the omitted facts."[4] Based on this language, plaintiff argues that the trial court erroneously required plaintiff to plead with particularity the disclosure violations alleged. We agree that this language in the trial court's opinion, if taken literally, was erroneous. At best, it was simply an unfortunate choice of words. At worst, it was harmless error because we have concluded that, even under the proper pleading standard, the complaint fails to state a claim for damages.

In asserting direct claims, as distinct from stockholder derivative claims, the complaint need give only general notice of the claim asserted.[5] To state a claim upon which relief may be granted, plaintiff need only provide a well-pleaded "short and plain statement of the claim showing that the pleader is entitled to relief."[6] A requirement that the pleader state facts "with particularity" is reserved for derivative stockholder claims under Chancery Rule 23.1 and for fraud or mistake claims under Rule 9(b).[7] We see no reason to depart from the general pleading rules when alleging duty of disclosure violations.[8] Nevertheless, it is inherent in disclosure cases that the misstated or omitted facts be identified and that the pleading not be merely conclusory.

In evaluating ADM's motion to dismiss, therefore, the Court of Chancery was required to assume the truthfulness of all well-pleaded (i.e., nonconclusory) allegations of the complaint for purposes of the motion.[9] The trial court also was required to extend to the complaint "the benefit of all reasonable inferences that can be drawn from ... [the] pleading."[10] Moreover, as we held in *Solomon*, "a motion to dismiss, at such a preliminary stage, requires the court to determine with 'reasonable certainty' that a plaintiff could prevail on no set of facts that can be inferred from the pleadings."[11] It is well established, however, that "conclusions ... [contained in the complaint] will not be accepted as true without specific allegations of fact to support them."[12] This premise is embodied in our 1995 decision in *Santa Fe.*[13]

Plaintiff's argument seems to be that a plaintiff need provide only a conclusory statement of his claims in order to shift to the defendant the burden of proving full disclosure. In advancing this theory, plaintiff mistakenly relied on cases that involved the affirmative defense of ratification. In such a

---

3. In his opening brief before this Court, plaintiff did not raise the claim set forth in the original complaint concerning statements made by ADM director Johnson before the Emory University Business School. We therefore consider that claim waived and will not review it here. *See Turnbull v. Fink*, Del.Supr., 644 A.2d 1322 (1994).

4. Mem.Op. at 9, 14.

5. *Rabkin v. Philip A. Hunt Chemical Corp.*, Del. Supr., 498 A.2d 1099, 1104 (1985).

6. Ch.Ct.R. 8(a).

7. Superior Court Civil Rule 9(b) requires also that negligence be stated with particularity.

8. *See Solomon v. Pathe Communications Corp.*, Del.Supr., 672 A.2d 35, 39 (1996).

9. *Grobow v. Perot*, Del.Supr., 539 A.2d 180, 187 n. 6 (1988).

10. *In re USACafes, L.P.Litig.*, Del.Ch., 600 A.2d 43, 47 (1991).

11. *Solomon*, 672 A.2d at 38.

12. *In re Tri–Star Pictures, Inc. Litig.*, Del.Supr., 634 A.2d 319, 326 (1993).

13. *In re Santa Fe Pac. Corp. Shareholder Litig.*, Del.Supr., 669 A.2d 59, 65–66 (1995).

case, the party relying on ratification as a defense has the burden of demonstrating full and fair disclosure.[14] The trial court correctly held that ratification is not implicated in this case. Nevertheless, the trial court's opinion may be read as requiring that plaintiff plead "with particularity" the facts underlying the allegations in the complaint.

The trial court quoted a passage from this Court's *Santa Fe* opinion that "[n]on-disclosure claims must provide some basis for a court to infer that the alleged omissions were material."[15] *Santa Fe* did not purport to establish a pleading standard for disclosure cases that went beyond the requirements of Chancery Rule 8(a). Our 1996 decision in *Solomon* makes clear that Rule 8(a) applies to a complaint that is not derivative or does not allege fraud or mistake.[16]

■ There may sometimes be a fine line between the obligation to set forth well-pleaded allegations of ultimate fact under Rule 8(a) and the requirement in derivative or fraud cases to set forth facts with particularity. A claim based on disclosure violations must provide some basis for a court to infer that the alleged violations were material.[17] For example, a pleader must allege that facts are missing from the proxy statement, identify those facts, state why they meet the materiality standard and how the omission caused injury. Here we find independently that, even under a proper pleading standard, the

complaint fails to state a claim upon which relief can be granted.

### Claim for Damages

As we have noted, much of this case is moot.[18] The 1995 Annual Meeting of stockholders is ancient history. The terms of the directors elected at that meeting have come and gone. So the opportunity for injunctive or section 225 relief has come and gone. There is, however, a theoretical claim for damages, which we now take up.

There may be circumstances under which a proxy statement soliciting votes for the election of directors is actionable under Delaware law for material misstatements or omissions. Injunctive relief in the form of corrective disclosures and resolicitation may be appropriate if the matter is addressed in time by a court of equity.[19] It is difficult to see how damages may also be available in such a case.[20] Construing the complaint most favorably to plaintiff, we find that no cause of action for damages is stated.

■ Plaintiff seeks to invoke a *per se* rule of damages, relying on the following dictum in this Court's 1993 opinion in *Tri–Star:*[21] "In Delaware existing law and policy have evolved into a virtual *per se* rule of damages for breach of the fiduciary duty of disclosure."[22]

---

14. *See, e.g., Yiannatsis v. Stephanis,* Del.Supr., 653 A.2d 275 (1995).

15. *Santa Fe,* 669 A.2d at 66.

16. *Solomon,* 672 A.2d at 39.

17. *Santa Fe,* 669 A.2d at 66.

18. *See Buckley v. Archer–Daniels–Midland Co.,* 111 F.3d 524 (7th Cir.1997) (dismissing as moot a class action suit against ADM alleging federal disclosure violations in the proxy statement issued for the 1995 annual meeting where, at the time of the suit, officers elected at that meeting had completed their one-year terms and another election had already taken place). We pause to observe here that the federal scheme of disclosure is not replicated in Delaware law. *Arnold v. Society for Sav. Bancorp., Inc.,* 678 A.2d 533, 539 (1996) (*"Arnold II"*).

19. *See Arnold II,* 678 A.2d at 537 n. 9.

20. Even if damages are theoretically available, ADM's certificate of incorporation may eliminate the availability of monetary damages against ADM directors under the authority of 8 *Del.C.* 102(b)(7). *Zirn v. VLI Corp.,* Del.Supr., 681 A.2d 1050, 1061–62 (1996) (disclosure violations resulting from good faith errors fell within the protection of section 102(b)(7)); *Arnold v. Society for Savs. Bancorp., Inc.,* Del.Supr., 650 A.2d 1270, 1287 (1994) (same). Because we hold that the plaintiff has failed to state a claim that would warrant an award of damages for directors' breach of disclosure duties, we do not reach the issue of whether ADM's exculpatory charter provision applies in this case.

21. *In re Tri–Star Pictures, Inc. Litig.,* Del.Supr., 634 A.2d 319 (1993).

22. *Id.* at 333. This Court mentioned the *Tri–Star* dictum in *Cinerama, Inc. v. Technicolor, Inc.,* Del.Supr., 663 A.2d 1156 (1995). In *Cinerama,* however, the Court agreed with the Court of Chancery's conclusion that the directors had

*Tri–Star* was a stockholder class action that involved the entire fairness of a complex business combination. The Court held that the pleadings , alleged sufficient individual monetary injury to stockholders resulting from the defendants' alleged manipulation of the combination so as to dilute the cash value and impinge on the voting rights of the minority's shares.[23] Disclosure violations were only one aspect of the case, and all that we address here. There, the trial court had held that proof of special damages was required for breach of the duty of disclosure and granted summary judgment because there was a failure of proof according to that standard. In reversing the trial court, the *Tri–Star* Court held that, under the circumstances of that case involving stockholder approval of an improperly manipulated transaction implicating cash values and voting rights, there should be some damage award.[24] The court cautioned, however, that if plaintiff sought more than nominal damages, proof (including expert testimony) would have to replace "hypothetical estimates." [25]

The Court in *Tri–Star* explained the context of the *per se* dictum quoted above. Cit-

ing cases involving breaches of disclosure duties where stockholders had approved economically injurious transactions, the Court recognized a discrete set of conditions in which a damage remedy for non-disclosure would be appropriate.[26] The particular facts of *Tri–Star* placed the case squarely within that context. Therefore, *Tri–Star* stands only for the narrow proposition that, where directors have breached their disclosure duties in a corporate transaction that has in turn caused impairment to the economic or voting rights of stockholders, there must at least be an award of nominal damages.[27] *Tri–Star* should not be read to stand for any broader proposition.

The plaintiff asserts here that the Proxy Statement issued by ADM in connection with the company's 1995 Annual Stockholder Meeting failed to disclose material facts. Plaintiff's damages claim therefore rests solely on the issue of election of directors. The circumstances recognized in *Tri–Star*— disclosure violations and deprivation of stockholders' economic or voting rights—that would give rise to a damages remedy are absent here.[28] In claiming damages for di-

---

complied with their disclosure duties and did not reach the issue of whether damages would have been warranted. *Id.* at 1176.

**23.** *Tri–Star*, 634 A.2d at 321.

**24.** *Id.* at 333; *see also Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858 (1985) (holding directors liable for damages where there had been dual breaches of the duties of care and disclosure so that the transaction could not withstand an entire fairness analysis).

**25.** *Tri–Star*, 634 A.2d at 334 n. 18.

**26.** The Court in *Tri–Star* relied on *Weinberger v. UOP, Inc.,* Del.Ch., C.A. No. 5642, Brown, C., slip op., 1985 WL 11546 (Jan. 30, 1985), *aff'd,* Del.Supr. 497 A.2d 792 (1985) (awarding damages of $1 per share where incomplete disclosure by interested directors in a cash-out merger caused economic injury to stockholders); *Smith v. Shell Petroleum, Inc.,* Del.Ch., C.A. No. 8395, Hartnett, V.C., slip op., 1990 WL 186446 (Nov. 26, 1990), *aff'd,* Del.Supr., 606 A.2d 112 (1992) (holding that award of $2 per share in monetary damages was justified where failure, through both error and intent, to disclose in a cash-out merger induced stockholders to accept an inadequate price); and *Gaffin v. Teledyne, Inc.,* Del. Ch., C.A. No. 5786, Hartnett, V.C., slip op., 1990 WL 195914 (Dec. 4, 1990) (awarding damages

arising from alleged equitable fraud in connection with a stock repurchase), *aff'd in part and rev'd in part,* Del.Supr., 611 A.2d 467 (1992) (leaving intact an award of $1 per share to individual plaintiff because there had been no cross-appeal as to the damages finding).

**27.** In the past, we have exempted directors from liability for good faith, unselfish breaches of fiduciary disclosure obligations pursuant to exculpatory charter provisions authorized by 8 *Del.C.* § 102(b)(7). *Arnold v. Society for Savings Bancorp,* Del.Supr., 650 A.2d 1270 (1994) ("*Arnold I*"); *Arnold v. Society for Savings Bancorp,* Del. Supr., 678 A.2d 533 (1996) ("*Arnold II*"); *Zirn v. VLI Corp.,* Del.Supr., 621 A.2d 773 (1993) ("*Zirn I*"); *Zirn v. VLI Corp.,* Del.Supr., 681 A.2d 1050 (1996) ("*Zirn II*"). It was not necessary in those cases to reach the issue of whether, in the absence of a charter provision, directors would be held liable for such breaches.

**28.** We do not decide whether or not a pleader must also allege any other elements (*e.g.,* negligence, gross negligence, intentional misconduct or reliance) to state a claim for damages based on disclosure violations. Those issues are not before us, and we decide only the case before us. *See Paramount Communications, Inc. v. QVC Network, Inc.,* Del.Supr., 637 A.2d 34, 51 (1994).

rectors' breach of the duty of disclosure in this instance, plaintiff takes out of context and would stretch too far the *Tri–Star* Court's dictum referred to above.[29]

We now turn *seriatim* to the alleged disclosure violations.

### Disclosures Concerning the Resignation of Howard Buffet

■ Plaintiff contends that the ADM Board breached its fiduciary duty by failing to disclose the facts surrounding former director Howard Buffet's resignation. The complaint averred, in conclusory terms, that Mr. Buffet resigned because he "refused to participate in Dwayne Andreas's plan to stonewall ADM stockholders, the media and Wall Street and did not believe the information he was receiving from ADM officials about the government's probe and related litigation." The trial court concluded that: (1) this information was not material; (2) even assuming *arguendo* that the information was material, pursuant to the rule relieving directors from the obligation to engage in self-flagellation, the ADM directors were not required to disclose the reasons for Buffet's resignation; and (3) any effort by a Delaware court to force disclosure of this information would conflict with federal proxy rules.

■ It is well established that "directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action."[30] An omitted fact is material if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote.[31] To prevail on a claim of material

omission, therefore, a plaintiff must demonstrate a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable stockholder. There must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable stockholder as having significantly altered the "total mix" of information made available.[32]

■ The directors' duty of disclosure does not oblige them to characterize their conduct in such a way as to admit wrongdoing. As this Court held in *Stroud*, "a board is not required to engage in 'self-flagellation' and draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication of the matter."[33] Thus, even where material facts must be disclosed, negative inferences or characterizations of misconduct or breach of fiduciary duty need not be articulated.[34]

Plaintiff contends that it is material that ADM Board member Buffet allegedly tendered his resignation in response to the perceived wrongdoing of other Board members, and, if true, that is a fact that a reasonable ADM stockholder would want to know in deciding how to vote. Plaintiff contends that disclosure of Mr. Buffet's alleged views does not amount to self-flagellation because all that needed to be disclosed were the objective facts surrounding his resignation and the reasons he advanced for tendering that resignation. Plaintiff argues that the Board was free to state its disagreement with the allegations made by Mr. Buffet. Moreover, plaintiff claims that all that ADM was required to

---

29. *See* Lawrence A. Hamermesh, *Calling Off The Lynch Mob: The Corporate Director's Fiduciary Disclosure Duty*, 49 Vanderbilt L.Rev. 1087, 1170–72 (1996).

30. *Stroud v. Grace*, Del.Supr., 606 A.2d 75, 84 (1992).

31. *Arnold v. Society for Savs. Bancorp, Inc.*, Del. Supr., 650 A.2d 1270, 1277 (1994) (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 944 (1985) (adopting *Northway* standard as law of Delaware)).

32. *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. at 2132.

33. *Stroud*, 606 A.2d at 84 n. 1; *see also Michelson v. Duncan*, Del.Ch., 386 A.2d 1144, 1155 (1978), *aff'd in part*, Del.Supr., 407 A.2d 211, 222 (1979).

34. *See Warner Communications, Inc. v. Murdoch*, D.Del., 581 F.Supp. 1482, 1490 (1984) ("The rule limits only the duty to publicly admit to misconduct; it does not limit a party's duty to disclose all material facts relating to the party's actions, including those that might relate to misconduct.").

disclose was Mr. Buffet's opinion and belief that the Board was engaged in misconduct, which the Board would have been free to comment upon in the Proxy Statement.

This argument presents a novel disclosure theory. To be sure, it might be "better practice" for directors of a public corporation to be more candid and forthcoming in their communications to stockholders when presenting a slate for election to the board. It is a leap of logic, however, for this Court, applying a form of "common law" of corporate disclosure, to fashion a rule that attempts to draw—in a liability context—a bright line of disclosure for directorial elections. How much information must be imparted to the stockholders concerning positions previously taken by directors who have been dropped from the management slate? [35] When can it be said that omitted information about a former director's disagreement with management rises to the level of a "substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable shareholder"? [36] What is plaintiff's theory of causation and economic damage to him and other stockholders? The complaint before us does not state a well-pleaded claim that the nondisclosure of the background of Mr. Buffet's omission from the management slate was material or actionable.

### Disclosures Concerning the Special Litigation Committee

Plaintiff next contends that the Proxy Statement omitted material facts concerning the ADM Special Litigation Committee established in response to the then recent allegations of corporate wrongdoing. The complaint asserts that the Proxy Statement failed to disclose: (1) the selection process for members of the Committee; (2) the activities and goals of the Committee; (3) the

mandate of the Committee and its plans, if any, to retain outside counsel; and (4) the Committee's intended response to pending derivative litigation. The trial court correctly found that plaintiff failed to "identify any specific fact that should have been disclosed."

There is no support for the view that the particular details of a special litigation committee's activities must be disclosed. Moreover, the complaint fails to identify any material fact that the Board failed to disclose. The details of a corporation's inner workings and its day-to-day functioning are not the proper subject of disclosure. The allegations of the complaint amount to no more than conclusory statements that lack factual or inferential support sufficient for a court to determine materiality.[37] The trial court was correct in dismissing this claim.

On appeal, plaintiff attempts to cast his claim as one of material misstatement rather than omission.[38] Plaintiff alleges that the Proxy Statement indicated that the Special Litigation Committee was appointed to "oversee the Company's response to the investigation and related civil antitrust and securities litigation." This contention argues that this statement is materially misleading in light of the subsequent comment by ADM director and Committee member Brian Mulroney that "the Committee is not charged with the conduct of an independent investigation...." Plaintiff argues that ADM stockholders were left with the erroneous impression that the Committee was taking a proactive stance and actively investigating the alleged wrongdoing.

This contention fails, however, in light of the clear language of the Proxy Statement, which did not state that the Committee would investigate. On the contrary, it indicated that the Committee was charged with oversight of ADM's response to the investi-

---

**35.** One glaring omission in the complaint is the absence of any allegation that the directors knew why Buffet resigned and knowingly suppressed that information.

**36.** *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. at 2132.

**37.** *Santa Fe*, 669 A.2d at 65–66.

**38.** ADM correctly points out that the complaint did not allege any material misstatements and nowhere mentioned the facts now included in plaintiff's opening brief in support of this claim. Since we reject this claim, however, and plaintiff will be permitted to replead, the question of whether or not it is properly before the Court is of no moment.

gation conducted by the FBI. Further, subsequent comments made by ADM director Johnson bolster the view that, at the time the Proxy Statement was issued, ADM was adopting a wait-and-see posture.[39] Since ADM had professed its belief that the FBI investigation and various civil actions were without merit, the failure to disclose further the mandate of the Committee cannot be deemed materially misleading.

In a related claim, plaintiff takes issue with the Committee's decision to seek dismissal of the various derivative actions on the basis that a pre-suit demand was not made. In light of the Committee's decision to seek dismissal, the argument goes, the fact that the Committee is not charged with conducting an investigation becomes material. Defendants correctly argue that it is the Committee's right to seek dismissal for failure to serve a pre-suit demand on the Board.[40] The absence of any intention to conduct an independent investigation at this time does not vitiate this right. Such a disclosure requirement would oblige the Committee to speculate about its future plans. Speculation is not an appropriate subject for a proxy disclosure.

### Disclosures Concerning Price–Fixing and Improper Bonuses

■ Plaintiff contends that the trial court improperly dismissed his claims concerning ADM's failure to disclose various allegedly improper bonuses and illegal price-fixing activities. The complaint stated, in pertinent part, that the Proxy Statement failed to disclose: (1) "*whether* ... Michael Andreas was captured on video tape by the FBI discussing and agreeing to prices, production volumes and market share goals with officials from other companies;" and (2) "*whether* James R. Randall and other ADM directors ... approved bonuses to ADM officers ... through the use of false invoices...." (emphasis supplied). The trial court correctly concluded that these portions of the complaint do not state the omission of a material fact. Rather, they pose a question, the answer to which would seem to require the ADM Board to engage in self-flagellation. Nowhere does the complaint allege that, at the time the complaint was filed, an adjudication of these activities had occurred. Nevertheless, plaintiff's argument would have the ADM Board confess to wrongdoing prior to any adjudication of guilt. This is precisely the situation the self-flagellation rule was designed to prevent.[41]

Plaintiff attempts to skirt the self-flagellation rule by stating that the ADM Board was not required to characterize the activities as wrongful or improper. In the absence of such a qualifying statement, however, these activities would not be material to a reasonable stockholder's determination of how to vote in the directorial election. Absent any adjective describing the activity in a pejorative light, the relatively uncontroversial act of meeting with representatives of other market participants would not be of any importance to a stockholder faced with the directorial ballot. Similarly, the payment of bonuses to ADM officers is not particularly noteworthy, absent well-pleaded facts alleging that the bonuses were improper. Thus, the trial court correctly concluded that this portion of the complaint failed to state a legally cognizable claim.

### Disclosures Concerning the Board's Lack of Independence and Conflicts of Interest

■ Plaintiff asserts that the complaint's vague allegations concerning director disinterest and independence were sufficient to withstand dismissal and that the trial court erred by finding to the contrary. The complaint simply stated that "[t]he Proxy Statement failed to disclose all of the material facts concerning the Board's conflicts of interest and lack of independence." The trial court properly concluded, however, that this

**39.** According to the complaint, in discussing ADM's attitude toward the FBI investigation during his speech before the graduating class of Emory University Business School, Director Johnson stated, "Well, we don't know.... We just have to wait."

**40.** *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984).

**41.** *Stroud,* 606 A.2d at 84 n. 1.

conclusory allegation had failed to state a cognizable claim.

The conclusory allegations of non-disclosure fall precisely within the purview of *Santa Fe*.[42] Plaintiff's allegations need not be pleaded with particularity. Nevertheless, some factual basis must be provided from which the Court can infer materiality of an identified omitted fact. This is inherently a requirement for a disclosure claim.

### Conduct of the Stockholder Meeting

Plaintiff asserts that the trial court erred in dismissing his disclosure claims pertaining to the conduct of the stockholder meeting, pointing to the autocratic and authoritarian manner in which Chairman Andreas ran the meeting and refused to answer stockholder questions. The claim is that this conduct was tantamount to a disclosure violation and constituted stockholder disenfranchisement. This is a rather far-fetched contention. The trial court correctly held that the complaint does not properly allege that ADM failed to disclose that, as a result of Andreas' draconian handling of the stockholder meeting, a violation occurred. Further, the trial court correctly concluded that the complaint furnishes no support for the notion that stockholders at an annual meeting have a right to ask questions independent of their right to full disclosure.

Plaintiff argues that the conduct of Andreas made a "sham" of the meeting and eviscerated a meaningful exercise of the stockholder franchise. Plaintiff's allegation is couched in terms of a disclosure breach[43] rather than a disenfranchisement claim.[44] The issue is whether or not the disclosures provided to stockholders in ADM's disclosure materials were materially misleading, not how the stockholders' meeting was conducted. For the complaint to survive a motion to dismiss pursuant to Rule 12(b)(6), it must provide some plausible connection, consistent with the standards set forth in this opinion, between the disclosures *ex ante* and Mr. Andreas' *ex post* conduct of the stockholder meeting.[45]

### The Section 225 Action is Moot

The complaint sought to invoke the Court of Chancery's general equity jurisdiction and its statutory authority to determine the outcome of a contested election under 8 *Del.C.* § 225. The trial court refused to consider these claims under the alternative statutory basis, holding that the claims were not a proper subject for consideration under section 225, which provides as follows:

§ 225. **Contested election of directors; proceedings to determine validity.**

(a) Upon application of any stockholder or director, or any officer whose title to office is contested ... the Court of Chancery may hear and determine the validity of any election of any director, member of the governing body, or officer of any corporation, and the right of any person to hold such office, and, in case any such office is claimed by more than 1 person, may determine the person entitled thereto. . . .

Since the terms of the board members elected in 1995 have expired, this issue is moot.

### Conclusion

This Court has observed in the past that policy concerns place an important qualification on the maxim that every wrong must have a correlative remedy.[46] Injunctive relief or corrective disclosures may or may not have been an appropriate early remedy here. That issue is moot, and we express no opinion on it.

We hold that under Delaware law there is no *per se* rule that would allow damages for all director breaches of the fiduciary duty of

---

42. *Santa Fe*, 669 A.2d at 65–66.

43. The complaint simply states that "[t]he board also breached its fiduciary duty of disclosure by failing to answer stockholders' questions at the annual meeting."

44. *Cf. Blasius Indus., Inc. v. Atlas Corp.*, Del.Ch., 564 A.2d 651, 663 (1988).

45. *Santa Fe*, 669 A.2d at 66 ("The materiality standard requires that directors disclose all facts which, 'under all the circumstances, ... would have assumed actual significance in the deliberations of the reasonable shareholder.'").

46. *Arnold II*, 678 A.2d at 541.

disclosure. The dictum in *Tri–Star* is confined to the facts of that case. Damages will be available only in circumstances where disclosure violations are concomitant with deprivation to stockholders' economic interests or impairment of their voting rights.[47] In every case, a plaintiff stating a claim against directors for violation of the duty of disclosure must set forth in a well-pleaded complaint allegations sufficient to warrant the remedy sought.

Accordingly, we affirm the judgment of the Court of Chancery. Because of the unique circumstances of this case, where we have been called upon to explicate pleading standards and the limited principles applicable to damages in a disclosure case, we remand for the sole purpose of allowing the plaintiff a reasonable opportunity to replead in a manner consistent with this opinion.

---

**47.** There is an analytical distinction between "ownership claim issues" and "enterprise issues" facing a board of directors. "Enterprise issues" are usually those involving management decisions affecting the enterprise and do not go to the heart of the individual stockholder's personal property interests. "Ownership claim issues" involve board decisions that have an immediate and profound impact on stockholders' rights. Included in the latter category would be deprivation to stockholders' financial investments, as the economic rights affected exist at the very core of stockholders' identity and purpose as stockholders. *See* Bayless Manning, *Reflections and Practical Tips on Life in the Boardroom After Van Gorkom*, 41 Bus Law. 1, 5–6 (1985); *see also* E. Norman Veasey, *The Defining Tension in Corporate Governance in America*, 52 Bus Law. 393, 394 (1997).