OPINION OF THE COURT
Emily Pines, J.
Following a stipulation entered into between the two individual plaintiffs and the defendants in this litigation, originally commenced as a putative class action based upon a now completed merger, and predicated upon a sale of defendant Medical Action Industries Inc. to defendant Owens & Minor, Inc., plaintiffs’ counsel have submitted an application for what they term reasonable attorneys’ fees in connection with the asserted substantial benefit they achieved for the Medical Action public shareholders as a result of their actions in causing valuable supplemental disclosures in connection with the defendants’ issuance of a Form 8-K in September 2014, following their application for injunctive relief but prior to the requisite shareholder vote on the merger. The defendants oppose the application on the grounds that plaintiffs’ counsel have no legal right to seek attorneys’ fees under the American rule, as such are merely an incident of litigation under both New York and Delaware law. They further oppose the application, stating that no substantial benefit was achieved via the supplemental disclosures as they were unnecessary and/or all material issues were set forth in the prior proxy statements filed with the Securities and Exchange Commission (SEC). Defendants also take issue, should the court reach the issue of the reasonableness of the fees sought, with the amount of the request both based upon an alleged lack of proper information and upon an assertedly inflated lodestar multiple.
In reply, the plaintiffs argue that any reading of the parties’ stipulation requires the court to disregard the defendants’ initial argument, as the parties clearly agreed that in exchange for plaintiffs’ discontinuance of their action, they would be permitted to seek attorneys’ fees from the court, and the only issues to be placed before the court would be whether they *547 conferred a substantial benefit to the public shareholders of Medical Action by being a causative factor in the issuance of the supplemental disclosures within the Form 8-K filed in September 2014 and whether the amount sought was reasonable. Plaintiffs also provide the court with numerous examples of attorneys’ fees awarded in alleged similar actions based upon additional disclosures procured by various plaintiffs prior to merger votes.
In surreply papers, permitted by the court, defendants argue that they preserved all defenses to plaintiffs’ request for attorneys’ fees in the parties’ stipulation agreement. In addition, defendants provide the court with two recent decisions by judges in the New York County Commercial Division, in which both refuse to approve settlements of putative class actions based upon, inter alia, the purported lack of merit of the actions themselves.
American Rule
There is no question nor is there any dispute among counsel herein that, absent a statutory provision providing for attorneys’ fees to a prevailing party or a contract which permits the same, courts in this state follow what is commonly referred to as the “American rule.” In New York, an attorneys’ fee is considered “merely an incident of litigation and is not recoverable absent a specific contractual provision or statutory authority” (214 Wall St. Assoc., LLC v Medical Arts-Huntington Realty, 99 AD3d 988, 990 [2d Dept 2012], quoting Levine v Infidelity, Inc., 2 AD3d 691 [2d Dept 2003]; see Matter of A.G. Ship Maintenance Corp. v Lezak, 69 NY2d 1 [1986]). Accordingly, an award of fees must be based upon a specific contractual provision or statute (see 546-552 W. 146th St. LLC v Arfa, 99 AD3d 117 [1st Dept 2012]).
The subject stipulation contains terms providing for the following process:
(1) the defendants are relieved from the obligation to answer, move against or respond to the complaint; (2) the plaintiffs are permitted to make an application for attorneys’ fees and a schedule is set forth for opposition, reply and a hearing; (3) following the court’s order resolving the fee application, the court is to be provided with a stipulation from counsel directing the discontinuance of the action with prejudice and without fees except as provided in resolving the subject fee application; (4) the parties agree that plaintiffs were a causative factor in the *548 issuance of the subject Form 8-K; and (5) the above is made without prejudice to any defense any party may assert with respect to the fee application or other matter related thereto.
In the various “Whereas” clauses preceding the above, the parties specifically state why they have entered into the above agreements, stating, in pertinent part, that the parties wish to avoid the expense and uncertainty associated with continued litigation and that they desire to set forth a process that provides for dismissal of the action and allows plaintiffs’ counsel to apply to the court for a reasonable award of attorneys’ fees and expenses.
A fundamental tenet of contract law requires that agreements be interpreted in view of the intent of the parties in entering into the same (Schron v Troutman Sanders LLP, 20 NY3d 430 [2013]; Goldman v White Plains Ctr. for Nursing Care, LLC, 11 NY3d 173 [2008]). The court, when asked to interpret a contract, must look to the purpose of the parties in entering into the agreement (Greenfield v Philles Records, 98 NY2d 562 [2002]; Morgan v Herzog, 301 NY 127 [1950]; Madison Ave. Leasehold, LLC v Madison Bentley Assoc. LLC, 30 AD3d 1 [1st Dept 2006], affd 8 NY3d 59 [2006]). If the parties’ purpose in entering into a contract can be ascertained, such takes precedence over all other canons of construction (Evans v Famous Music Corp., 1 NY3d 452 [2004]).
The purpose of the stipulation at issue is clear to the extent that it sets forth a process whereby the parties have decided to avoid the expense of continued litigation and at the same time permit plaintiffs’ counsel to place before the court a request for attorneys’ fees. There is no question the defendants have reserved their right to challenge the reasonableness of the request and, in that context, whether or not plaintiffs’ counsel have achieved any benefit, substantial or otherwise, in being a causative factor in the Medical Action filing of the subject Form 8-K with the SEC. However, there exists no purpose whatsoever in allowing for the application if it is, as argued by defendants, illegal on its face. The entire purpose of the stipulation is to avoid expense of litigation and allow the application for counsel fees; to permit an application which is illegal on its face would render the agreement, in the view of the court, completely illusory.
The court does not find the additional argument raised by defendants that New York courts do not recognize the “substantial benefit” doctrine convincing. They cite the Second Depart- *549 merit’s reversal of the award of attorneys’ fees in a case where the trial court had awarded fees based upon a stipulation following conditional certification of a class under CPLR 909 (see Louisiana Mun. Employees’ Retirement Sys. v Cablevision Sys. Corp., 74 AD3d 1291 [2d Dept 2010]). However, the denial of fees in that case was based upon the lack of a settlement which had become void as a result of non-consummation of a contemplated transaction and a finding that the statutory provision on which plaintiffs were relying only permitted payment of attorneys’ fees out of a common fund except in extraordinary circumstances. (Id. at 1292.) Plaintiffs in this case are basing their application upon an agreement and not a statutory provision.
Substantial Benefit
Once the court is convinced that the issue of entitlement to attorneys’ fees is not governed by the American rule as a result of the signed contract permitting such to be sought, the court must determine, in an action involving a shareholders’ derivative litigation, whether the actions taken by the plaintiffs achieved a substantial benefit for the stockholders or the corporation. As set forth by the United States Supreme Court, a shareholder whose acts result in a substantial benefit to the corporate entity is entitled to recovery of his costs and expenses. (Mills v Electric Auto-Lite Co., 396 US 375 [1970].) However, as the Court stated, the term “substantial benefit” requires demonstration and does not derive from a mere technical act; rather, it must actually accomplish a result that corrects a wrong that would, inter alia, interfere with the protection of essential rights of the shareholders. (Id. at 396.) Under Delaware law, the substantial benefit doctrine has been applied in relation to applications for attorneys’ fee awards in cases where the asserted benefit achieved by the litigation is the procurement of additional disclosures; however, in such instances, the plaintiffs must demonstrate that there exists “a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable stockholder as having significantly altered the ‘total mix’ of information made available” (Loudon v Archer-Daniels-Midland Co., 700 A2d 135, 143 [Del 1997]).
Where the application for attorneys’ fees on behalf of the plaintiff shareholders is based upon the assertion that the litigation resulted in the procurement of additional disclosure *550 that was previously omitted by corporate directors, the key to determination of the “substantial benefit” question appears to be whether the omitted fact(s) were “material,” i.e., whether there is a substantial likelihood that a reasonable stockholder would consider the newly revealed information important in deciding how to vote on a corporate transaction, such as a merger. (Loudon v Archer-Daniels-Midland Co., 700 A2d 135 [Del 1997]; Arnold v Society for Sav. Bancorp, Inc., 650 A2d 1270 [Del 1994], quoting TSC Industries, Inc. v Northway, Inc., 426 US 438 [1976]; Rosenblatt v Getty Oil Co., 493 A2d 929 [Del 1985].)*
As stated by the Delaware Supreme Court:
“An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. . . . It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused a reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the Total mix’ of information made available.” (Arnold at 1277 [emphasis omitted]; see TSC Industries, Inc. v Northway, Inc., 426 US 438, 449 [1976]; Rosenblatt v Getty Oil Co., 493 A2d 929, 944 [Del 1985]; In re Golden State Bancorp Inc. Shareholders Litig., 2000 WL 62964, 2000 Del Ch LEXIS 8 [Jan. 7, 2000, No. Civ-A-16175].)
In support of their application for attorneys’ fees in the sum of $925,000, plaintiffs’ attorneys claim that their efforts conferred a substantial benefit on the public shareholders of Medical Action.
Assurances of Continued Employment
Plaintiffs assert that in the course of expedited discovery, they uncovered information demonstrating that the outside *551 financial advisor, Canaccord, had solicited assurances of continued employment for Medical Action’s management from the bidders and that while Owens & Minor provided such, Company B, which had offered a higher per share figure, did not. In its supplemental disclosure, the following was set forth:
“In addition to price terms, the bid procedures letter requested that each bidder provide information regarding its intentions to retain Company management and employees. . . .
“In their respective submissions, Owens & Minor noted that it expected to retain the Company team including its strategic business unit management, Company B did not address retention of management or employees, and Company A noted that it expected to retain Company management, sales, manufacturing and most general and administrative personnel for the foreseeable future.”
Defendants responded that the request by Medical Action was a far cry from requesting “assurances” of continued employment, and, in any event, the merger agreement specifically stated that “[n]othing contained herein shall be construed as requiring . . . Parent of the Surviving Corporation ... to continue the employment of any specific person.”
Ties to Owens & Minor
Plaintiffs claim that the company did not originally disclose its significant financial ties to Owens & Minor, yet in the supplemental disclosure it set forth that Owens & Minor accounted for approximately 45% of Medical Action’s net sales for 2014 and 41% for 2013. In addition, plaintiffs contend that the company had failed to disclose its financial relationship with one of the Board members who was a former employee for 38 years of Owens & Minor and who was not prevented from participating in the sales process. Yet, they assert that such was set forth in the supplemental disclosure.
Defendants argue that the financial relationship with Owens & Minor was already disclosed in its June 16, 2014 Form 10-K, which its proxy incorporated by reference. In addition the Form 8-K explained that this relationship was neither quantified nor a factor in the decision to sell to Owens & Minor. With regard to the disclosure concerning the “interested” Board member, defendants assert that the disclosure that he had been an employee of Owens & Minor was irrelevant as he had retired 10 *552 years earlier and, in any event, what had been originally revealed was his stock ownership in Medical Action, demonstrating his obvious desire to obtain the highest price possible for his stock.
Range of Synergies Values and Choice of Strategic Buyers
According to plaintiffs, the company originally failed to set forth the monetary value of Medical Action to a synergistic buyer such as Owens & Minor, and how management valued the company’s synergies in order to alert shareholders to the maximum price the company felt it could achieve through the buyout. The supplemental disclosure did, however, set forth the management’s estimates of synergies available to strategic buyers, on which Medical Action was focusing, as well as potential cost savings created by such synergies.
On the other hand, defendants assert that the disclosure of the value of such synergies was unnecessary since it simultaneously disclosed that the projected valuation at the $26.81 per share range (the ultimate high end) was considered by neither the financial advisor nor the Board and that neither considered such a price to be reasonably achievable through a sales process. Defendants cite the case of Arnold v Society for Sav. Bancorp (650 A2d at 1282) for the proposition that the best-case projection predicated on an interplay of uncertain variables need not and indeed should not be disclosed as it is predicated on an interplay of uncertain variables and may, in and of itself, be a material misrepresentation. (Id. at 1282-1283.) With regard to the focus on strategic buyers, defendants claim that such was of dubious importance since it merely demonstrated that the Board conducted an appropriate process.
Antitrust Risk
Plaintiffs contend that it was only the supplemental disclosures which described precisely what information was considered in reaching the determination that the Owens & Minor offer was less risky than those of Company A and Company B and that acquisition by either of such companies was of concern due to antitrust risk which could require potential divestitures and resultant time delays.
Defendants respond by stating both that the supplemental disclosures state that Medical Action did not assign any specific monetary value to the antitrust terms and while clarifying the Board’s review of the antitrust risk, these disclosures did not provide any additional material and necessary information.
*553 Waiver of Standstill Provisions
According to plaintiffs, the original proxy did not disclose that Medical Action could and would entertain a waiver of the standstill agreement permitting Companies A and B to seek the same and, if granted, allow such competitive bidders to make a superior offer and that Owens & Minor would not claim that the granting of the waiver request was impermissible. They further state that the supplemental disclosure informed the shareholders of these issues and publicly stated for the first time that Owens & Minor would not take the position that the granting of such waiver requests was impermissible. In part, the supplemental disclosure set forth that
“[d]uring negotiations regarding the non-disclosure agreement, the Company declined Company B’s request that any standstill provisions would terminate upon the Company entering into an agreement to sell the Company to another bidder. Since the announcement of the proposed Merger, [n] either Company A nor Company B has made a proposal to acquire the Company, nor has either Company A or Company B requested the Company’s consent for a waiver of the standstill provisions in their respective non-disclosure agreements. If Company A or Company B requested such a waiver from the Company, the Company would consider such a request in good faith and consistent with its fiduciary duties. The Company is of the view, and Owens & Minor . . . have advised that they concur with our view, that nothing in the ‘No Solicitation’ section of the Merger Agreement prohibits the Company from waiving the standstill provisions in the non-disclosure agreements entered into with Company A and Company B in response to a request for such a waiver.”
Thus, according to plaintiffs, these disclosures provided the competitive bidders with the Board’s opinion that they had the ability to seek and that the Board could grant a waiver, opening the door for them to submit an offer superior to that of Owens & Minor.
Defendants set forth that the question as to whether Medical Action could and would consider a waiver of the standstill provisions included in the nondisclosure agreements was not an open one to anyone other than plaintiffs and, in any case, that there exists no evidence that either Company A or Company B *554 had any question about the meaning or operations of such nondisclosure provisions. In addition, since neither Company A nor Company B approached Medical Action with a request for such waiver after the supplemental disclosure occurred, this shows that they already understood that the request was permissible.
Identification of Precedent Transactions
Plaintiffs stress that the original proxy failed to disclose that the projections that formed the basis for Canaccord’s discounted cash flow were prepared solely by such financial advisor and not by management itself. In addition, they stress that the proxy did not include a fair summary of all the valuation methods Canaccord utilized to reach its fairness opinion. Only the supplemental disclosure assertedly revealed precedent transactions that compared the subject buyout to past merger transactions and for the first time actually named the selected peer companies and demonstrated the multiples for each so that Medical Action shareholders would be able to compare such to the consideration offered in the current buyout.
Defendants argue, in turn, that the proxy specifically states that “[C]anaccord . . . utilized estimates and projections approved by the Company’s management for fiscal years 2015 [through] 2018.” Therefore, there is no way shareholders would have suspected that management somehow prepared such projections. More significantly, defendants cite case law setting forth that where, as in this case, financial information sought is merely cumulative to other information provided, no disclosure duty exists. (In re Staples, Inc. Shareholders Litig., 792 A2d 934 [Del Ch 2001].) In addition, defendants set forth that shareholders do not require disclosure of each of the individual multiples to determine whether certain selected transactions were more comparable to the one proposed, and that disclosure of high, median and mean market multiples are all that are required to be revealed. (In re Celera Corp. Shareholder Litig., 2012 WL 1020471, 2012 Del Ch LEXIS 66 [Mar. 23, 2012, No. 6304-VCP].) Such were allegedly revealed in the original proxy.
Viewing the plaintiffs’ claims that their action produced substantial benefits to the entity and its shareholders by virtue of disclosing material information allowing the shareholders to make a reasoned determination in their decision to support or oppose the proposed merger, the court finds that some benefit *555 was conferred as a result of certain but not all of the subject disclosures. The court agrees with defendants that there was no disclosure of assurances of future employment; rather, the supplemental disclosure set forth that each prospective bidder was asked to provide information regarding “its intentions to retain Company management and employees.” In addition the merger agreement itself did specifically state that there existed no requirement that the parent or surviving corporation continue to retain any Medical Action employees whatsoever.
Likewise, for the reason set forth by the defendants, this court does not believe that the disclosure of ties to Owens & Minor was withheld from shareholders. The proxy incorporated by reference in the company’s June 16, 2014 Form 10-K specifically states that “[s]ales to Owens & Minor . . . accounted for approximately 45% ... of total net sales ... for fiscal 2014 [and] 41% ... of total net sales . . . for fiscal 2013.” While the court agrees with plaintiffs that such disclosure was in fact important, the supplemental disclosure of the same was redundant. The court likewise agrees with defendants that the prior employment of one Board member 10 years ago, who currently is a stockholder in the company, is not material as he would clearly currently be interested in obtaining the highest possible sum for his own shares.
With regard to the disclosure of the total range of synergies values, the court finds that such is marginally material where, as in this case, it set forth why some were not considered by the financial advisor and it also demonstrated why only certain strategic buyers were considered. While defendants argue that this only demonstrated that the Board acted appropriately (a statement with which this court agrees), that does not render the disclosure totally immaterial, but, rather, assures the voting shareholder that the Board did not breach its fiduciary duties in making its choice. This is not a case, akin to Arnold v Society for Sav. Bancorp, where disclosure of what could and could not be obtained did not inure to the benefit of shareholder voters.
While defendants aver that disclosure of the relative antitrust risk of the three bidders was irrelevant as no monetary value was assigned to the same, the court agrees with plaintiffs that this was a marginally material disclosure as it set forth that the Board had in fact determined that it considered that the Owens & Minor offer was indeed less risky and less likely to involve the need for divestiture and/or delay than the competing offers.
*556 Likewise, the court agrees that the supplemental disclosure that the competing bidders were entitled to seek and that the company was entitled to grant a waiver of the standstill agreement and, if granted, would allow the competitive bidders to make a superior offer coupled with the fact that neither had done so as of the date of the disclosure is somewhat significant. Such disclosure permits the shareholders to consider that in the relative mix of whether the offer to be voted on maximizes the value of their shares. While defendants make light of this disclosure, the court did not find the initial disclosures to be at all clear on this particular point.
On the other hand, the court agrees with defendants that the disclosures regarding Canaccord’s role in preparing its discounted cash flow as well as the additional information regarding every multiple reviewed were not material. Indeed, the proxy itself did disclose that the financial advisor and not the Board utilized estimates and projections which it provided for approval to the company’s Board. In addition, the case law cited by defendants does state that it is unnecessary to disclose each and every multiple utilized by the financial advisor where certain selected transactions were more comparable to the one proposed (see In re Celera, 2012 WL 1020471, 2012 Del Ch LEXIS 66).
Based on the above, the court finds that several of the additional disclosures which the parties have stipulated were due to the commencement of this litigation were somewhat material and conferred a benefit upon the stockholders by providing a heightened level of corporate disclosure. (Tandycrafts, Inc. v Initio Partners, 562 A2d 1162 [Del 1989].) Where a common benefit has been conferred, such as additional disclosure described herein, Delaware law provides that all stockholders should contribute to the costs incurred to bring about the benefit. (Id. at 1164.) While the amount of such fees is considered within the discretion of the court, the determination should balance the need to encourage future meritorious lawsuits and avoid “socially unwholesome windfalls” (Korn v New Castle County, 2007 WL 2981939, *2, 2007 Del Ch LEXIS 139, *11 [Oct. 3, 2007, No. 767-CC]).
Amount of Fees
As stated by plaintiffs’ counsel, the court typically reviews factors set forth by the Delaware Supreme Court in Sugarland Indus., Inc. v Thomas (420 A2d 142 [Del 1980]) in determining *557 the amount of fees in a particular case. These include: (1) the amount of time and effort applied to the case by counsel for the plaintiffs; (2) the relative complexities of the litigation; (3) the standing and ability of petitioning counsel; (4) the contingent nature of the litigation; (5) the stage at which the litigation ended; (6) whether the particular plaintiffs can rightly receive all the credit for the benefit conferred or only a portion thereof; and (7) the size of the benefit conferred (id. at 149-150; In re Plains Resources Inc., 2005 WL 332811, 2005 Del Ch LEXIS 12 [Feb. 4, 2005, No. Civ-A-071-N]).
Determinations of an appropriate fee award, in cases involving a benefit conferred resulting from supplemental disclosures, have led courts to review cases involving similar disclosures which have stated that such merit similar awards (see In re Sauer-Danfoss Inc. Shareholders Litig., 65 A3d 1116 [Del Ch 2011]). Thus, fee applications based upon non-monetary benefits, such as in the case at bar, are most often based upon the various decisions emanating from the Delaware courts which provide the court with some guidance (see In re Dr. Pepper/Seven Up Cos., Inc. Shareholders Litig., 1996 WL 74214, 1996 Del Ch LEXIS 21 [Feb. 9, 1996, No. 13109]). Counsel for plaintiffs and defendants have provided the court with examples of fee awards in disclosure cases, which each asserts are most similar to the case at bar. As stated by the Delaware Chancery Court, such awards can be helpful because enhanced disclosure confers an “intangible, non-quantifiable benefit.” (In re Sauer-Danfoss Inc. at 1136.) That court set forth that the magnitude of the benefit should not be based upon the size of the merger deal. (Id.)
The court has reviewed the cases annexed to plaintiffs’ papers, as well as the substantial comments by defendants’ counsel on this issue and the guidance provided by the Delaware Chancery Court. In this case, the court believes that the additional disclosures were of some material benefit in two instances — involving antitrust risk and the ability to waive the standstill provisions in the nondisclosure agreements — and, as stated, of minor benefit in the instance of disclosure of synergies values considered. On the other hand, as set forth, other disclosures were either duplicative of ones already provided or insignificant. The Delaware courts have provided that awards of between $400,000 and $500,000 for a few meaningful disclosures are appropriate whereas far lower awards in the $75,000 to $80,000 range are common where disclosures are relatively insignificant.
*558 In this case, the court has found that two of the disclosures as set forth above were neither insignificant nor substantial. In addition, in this case, there is no question as to the standing of counsel who have been involved in many of these cases. The plaintiffs’ counsel have provided the court with a “lodestar” calculation based upon multiplication of the number of hours spent by counsel by the hourly rate for services. Plaintiffs’ counsel state that they have expended 1,114 hours litigating this action with a total lodestar of $571,430 and request an additional $23,361.82 of unreimbursed expenses including expert fees. They utilize a multiplier of 1.6 to arrive at the $925,000 figure sought herein. Defendants’ counsel state that the insignificance of the result as well as the stage at which the litigation concluded would require a reduction rather than a multiplier to be utilized and also object to the lack of time records produced. At oral argument, one of defendants’ counsel suggested that an appropriate award in a case such as this, were the court to disregard the legal issues raised, would be in the realm of $100,000.
This court is persuaded that while the material disclosed was somewhat significant, it was settled both at an early stage of the litigation and before any class was certified. While the court did not find the issues raised particularly novel, the court recognizes the contingent nature of the case and the time limitations imposed. Thus, even though the level of complexity was not high, plaintiffs’ counsel pursued this litigation in a diligent and competent manner. Based upon all of the above considerations, the court believes that a fee somewhat lower than that within the range set forth by the Delaware Chancery Court to be warranted (see In re Sauer-Danfoss at 1136). Taking all of the above factors into account, the court awards attorneys’ fees and expenses in the amount of $250,000 to plaintiffs’ counsel.

 Since Medical Action is a Delaware corporation, Delaware law must be applied to the issue of the materiality of disclosures in conjunction with an application for attorneys’ fees.