Fabricant, Judith, J.
The plaintiffs seek an injunction to prevent, pending additional disclosure, a shareholder vote now scheduled for October 27, 2010, on the proposed acquisition of LSB Corporation (the parent of River Bank) by People’s Financial Corporation (the parent of People’s United Bank). After hearing, and review of all materials submitted, the Court concludes that the motion for preliminaiy injunction should be denied, for the following reasons.
For purposes of the present motion, the parties agree that the question of likelihood of success on the merits is limited to the plaintiffs claims of inadequate disclosure. The law requires directors soliciting shareholder approval of a merger to disclose to shareholders all information that is material to their vote. Skeen v. Jo-Ann Stores, Inc., 750 A.2d 1170, 1172 (Del. 2000). Information is material “if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote." Louden v. Archer-Daniels-Midland Co., 700 A.2d 135, 142 (Del. 1997). “Omitted facts are not material simply because they might be helpful.” Skeen, 750 A.2d at 1174. Rather, a fact is material only if it “significantly alters the total mix of information made available.” Id. With respect to financial analyses supporting an opinion of value relied on by the directors, shareholders are not entitled to “all the financial data they would need if they were making an independent determination of fair value.” Id. What directors must provide, rather, is a “fair summary.” In re Checkfree Corp. Shareholders Litig., 2007 WL 3262188 at *3 (Del.Ch. 2007).
Here, the proxy statement provided to shareholders runs 66 pages, exclusive of attachments. It sets out, in extensive detail: the terms of the proposed merger; the background leading up to it, including the strategic analyses that led LSB to consider seeking a purchaser; and the process through which it did so, which included solicitation of bids from eight potential purchasers, expressions of interest from six, proposals from four, and then negotiations with two, resulting in acceptance of a final offer from People’s United. The statement describes in similarly extensive detail the reasons the directors judged the People’s United bid most advantageous, along with the negotiations leading to the final merger agreement.
The statement discusses the financial projections management developed, and sets forth a subset of those projections, explaining the limitations of that subset and the reasons the projections are not set forth in their entirely. The subset includes projected income, loan losses, earnings, and leverage and capital ratios for the next four years. The statement goes on to express the directors’ recommendation that stockholders approve the merger, along with the reasons for that recommendation. Among the reasons stated is Sandler O’Neill’s opinion, as later set forth in the statement, as well as the presentation made by Sandler to the board on July 15, 2010, and its opinion letter of that date, a copy of which is attached.
The proxy statement then describes Sandler O’Neill, the role it performed in arranging the merger and advising the board, the process by which it evaluated the fairness of the transaction, and the opinion it provided to the board. It provides Sandler’s summary of the financial aspects of the merger. It then states that “Sandler O’Neill also used publicly available information to perform a comparison of selected financial and market trading information for LSB and a group of financial institutions selected by Sandler O’Neill,” and proceeds to set forth Sandler’s comparison of LSB with 21 publicly traded commercial banks and thrifts in New England in the same asset range. The statement states that Sandler compared the “high, low, mean and median financial and market trading *501 data for the group for the year ending March 31,2010"; it provides charts showing median figures. The statement also sets forth Sandler’s analysis estimating the present value of LSB shares, based on assumptions reflecting a range of earnings and discount rate multiples as applied to management projections. It also sets forth the results of Sandler’s analysis of 33 merger transactions involving New England banks over the previous eighteen months. The statement also discloses Sandler’s fee, along with the fact that ”a substantial portion" of it is contingent upon consummation of the merger.
The proxy statement also describes, in extensive detail, the so-called “change in control” payments, and certain other payments, that will be due to certain management personnel (only one of whom is a director) as a result of consummation of the merger. It also discloses stock holdings of directors and officers, and the terms of agreements imposing obligations on them relating to voting their shares.
There follows an extensive summary of the terms of the merger agreement, including terms limiting LSB’s conduct pending consummation of the merger (including with respect to soliciting or consideration other proposals), and terms relating to the possibility of termination by either side prior to consummation. Finally, the proxy statement also discloses the pendency of this litigation, describing the allegations of the amended complaints in detail, including the allegations of particular inadequacies in the proxy statement.[2]
Plaintiffs’ amended complaint, which is not verified or supported by any affidavit, alleges a list of omissions that plaintiffs contend are material. In response, defendants have submitted the affidavit of Maiy Anne Callahan, the Sandler O’Neill principal who is primarily responsible for the transaction. Callahan’s affidavit directly addresses each of the alleged omissions, explaining, with respect to each, why the information is not material, and in some instances, would not be meaningful or useful to shareholders. In light of her extensive qualifications and experience, as set forth in the affidavit, the Court finds Callahan’s opinions as to materiality credible.[3] Plaintiffs do not offer any expert opinion of their own to rebut Callahan. They rely, instead, on portions of her deposition testimony (given on October 20, 2010), which they contend undermine her affidavit.
Based on plaintiffs’ reply brief and oral argument, three issues appear to be paramount. First, plaintiffs point to Callahan’s acknowledgment at her deposition that the comparable company analysis set forth in the proxy statement differs from the analysis that Sandler presented to the board on July 15, 2010, in two respects: it omits Wainwright Bank from the list of comparable companies, and it uses a historical metric (price/LTM earnings per share) as opposed to projection-based metric (price/2010 earnings) as used in the July 15 presentation. Based on these differences, and the absence from the proxy statement of disclosure of the differences, the plaintiffs contend that the proxy statement is false.
Callahan’s deposition testimony on this point is no surprise; the amended complaint points out these differences, and Callahan addresses them directly in her affidavit. She explains that Wainwright was excluded from the list of comparable companies in the proxy statement because it was already the target of an acquisition, which affected its data. Exclusion of Wainwright changes the results of the analysis, but not materially. As to the historical metric, she explains that the change was made so as to use only publicly available information, and that “the quantitative and qualitative difference between the two bases for comparison is insignificant." Callahan’s deposition testimony on both points is entirely consistent with her affidavit.
As to disclosure of the change, the plaintiffs theory of falsehood appears to arise from a misreading of the proxy statement. It does not say, as the plaintiffs seem to suggest, that the comparable company analysis set forth is identical to the presentation Sandler made to the board on July 15, 2010, or to any component of that presentation. It does refer to the presentation, and to Sandler’s opinion, which is attached, but it makes no representations as to the precise content of that presentation, beyond the opinion of fairness. With respect to the analysis of comparable companies, what the proxy statement says is simply that “Sandler O’Neill also used publicly available information to perform a comparison of selected financial and market trading information for LSB and a group of financial institutions selected by Sandler O’Neill.” Nothing before the Court provides any basis to conclude that that statement was in any respect untrue.
The second issue the plaintiffs press is that the statement gives only median figures for the comparable companies, and not high, low and mean figures. Callahan states in her affidavit that “I believe that the median data point for these financial metrics is the most meaningful point of comparison from a financial point of view.” She points out also that the analysis of comparable companies is based entirely on publicly available data, so that readers can, if they choose, conduct their own analysis using other metrics. Plaintiffs’ response to this opinion is to submit proxy statements filed by three non-bank corporations that do include the metrics they favor. This information, in the Court’s view, is simply irrelevant; that other companies chose to include that information in statements to their shareholders, seeking approval of the particular transactions proposed in those instances, has no bearing on whether it would be material to LSB’s shareholders in deciding how to vote on this transaction.
Finally, plaintiffs press their contention that the proxy statement is deficient in that it omits management’s projections regarding free cash flows. Callahan addresses this point in her affidavit, expressing her opinion that free cash flows “are not meaningful for a regulated depository institution like LSB,” although they may be *502 significant for companies in some other industries. Banks, she explains, are generally valued based on “net income, tangible book value and core deposits . . . Projected tangible book value can be readily calculated by adding projected net income to LSB’s published tangible book value as of December 31, 1009.”[4]
Plaintiffs offer no contrary evidence, but cite the decision of the Delaware Chancery Court in Maric Capital Master Fund, Ltd. v. Plato Learning, Inc., 2010 Del.Ch. LEXIS 115, *3 (Del.Ch. May 13, 2010). The Court in that case found the proxy statement defective because, among other omissions and misstatements, it “selectively disclosed projections relating to Plato’s future performance,” in that, without explanation, it “excised the free cash flow estimates” that management had provided to its financial advisor. Such projections, the Court opined, are “clearly material information.” Id. Nothing in the decision suggests that Plato, the company being acquired, was a bank; perhaps for that reason, the decision does not address the difference that Callahan identifies between valuation of banks and other kinds of companies.
Plaintiffs’ reply memorandum cites other portions of Callahan’s deposition testimony that plaintiffs characterize as inconsistent with her affidavit. Having reviewed the deposition as a whole, the Court is not persuaded that any inconsistency appears, or that anything in the testimony undermines the credibility of the opinions expressed in the affidavit. Overall, the Court concludes that the plaintiffs have not established a likelihood of success on the merits of their claim of inadequate disclosure. Accordingly, no preliminary injunction is warranted.
CONCLUSION AND ORDER
For the reasons stated, the Plaintiffs’ Emergency Motion for a Preliminary Injunction is DENIED.

 The plaintiffs filed their amended complaints after LSB had filed its preliminary proxy statement, enabling LSB to reflect the plaintiffs allegations in the final proxy statement.

 The Court does not disregard her interest in consummation of the merger.

 At her deposition Callahan testified that LSB did not provide Sandler O’Neill with free cash flow projections, because “that is not a typical metric” upon which to value a bank; “when you apply the concept of free cash flow you are really misapplying it to the banking industry. It is a concept for industrial companies.”