# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LEGENT GROUP, LLC, COR ADVISORS LLC, ST. CLOUD CAPITAL PARTNERS II, L.P., and CARLOS P. SALAS | ) ) ) ) ) | |
| Plaintiffs and Counterclaim-Defendants, | ) ) ) | |
| v. | ) ) | C.A. No. 2020-0405-KSJM |
| AXOS FINANCIAL, INC., AXOS SECURITIES, LLC (as successor in interest to Axos Clearing, LLC), AXOS CLEARING, INC. (as successor in interest to Axos Clarity MergerCo, Inc.), and AXOS CLEARING LLC | ) ) ) ) ) ) ) ) | |
| Defendants and Counterclaim-Plaintiffs. | ) ) ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: May 29, 2025
Date Decided: November 7, 2025

Thomas E. Hanson, Jr., William J. Burton, BARNES & THORNBURG LLP, Wilmington, Delaware; Mona Z. Hanna, Todd H. Stitt, MICHELMAN & ROBINSON, LLP, Irvine, California; Seth E. Darmstadter, Matthew R. Lasky, RAINES FELDMAN LITTRELL LLP, Chicago, Illinois; *Counsel for Plaintiffs and Counterclaim Defendants Legent Group, LLC, COR Advisors LLC, St. Cloud Capital Partners II, L.P., and Carlos P. Salas.*

Michael C. Heyden, Jr., GORDON REES SCULLY MANSKUHANI, LLP, Wilmington, Delaware; Polly Towill, Jay T. Ramsey, David M. Berger, SHEPPARD, MULLIN, RICHTER & HAMPTON LLP, Los Angeles, California; *Counsel for Defendants and Counterclaim Plaintiffs, Axos Financial, Inc., Axos Clearing, Inc., Axos Securities, LLC, and Axos Clearing LLC.*

**McCORMICK, C.**

This post-trial decision resolves buyers' claim to indemnification under a merger agreement. The defendant-buyers acquired a clearing firm from the plaintiff-sellers. A few weeks after the merger closed, a trader got caught in a short squeeze that cost the clearing firm $15.2 million. The buyers demanded indemnification from the sellers, claiming that the loss resulted from pre-merger defects in the risk-management systems of both the clearing firm and the trader's brokerage firm. The buyers claim that these defects rendered two representations in the merger agreement inaccurate—a legal-compliance representation and a counterparty-breach representation. Based on their claim of indemnification, the buyers withheld from sellers payments due under notes comprising a portion of the merger consideration. The sellers then filed this action seeking a declaratory judgment that they are not obligated under the merger agreement to indemnify the buyers for the $15.2 million. At trial, the buyers bore the burden of proving that the representations on which they relied were inaccurate and that those inaccuracies caused the loss. They failed to prove the inaccuracy of either the legal-compliance or the counterparty-breach representations. They also failed to prove causation. This post-trial decision enters judgment for the sellers.

I.     FACTUAL BACKGROUND

Trial took place over four days. The record comprises 239 trial exhibits, live testimony from four fact and four expert witnesses, testimony by video deposition

from two fact witnesses, testimony by deposition transcript of six witnesses, and 13 stipulations of fact. These are the facts as the court finds them after trial.[1]

## A. Clearing And Its Risk-Management System

COR Clearing LLC is a securities clearing firm that became Axos Clearing through the merger. For simplicity, this decision refers to COR Clearing and Axos Clearing as "Clearing," or the "Company."

Securities clearing firms are FINRA-regulated businesses that serve as intermediaries in securities transactions. Clearing firms perform custody, clearing, and settlement services for the securities trades of their customer broker-dealers, known as introducing broker-dealers ("IBDs").

---

[1] This decision cites to: C.A. No. 2020-0405-KSJM docket entries (by docket "Dkt." number); trial exhibits (by "JX-" number); the trial transcript, Dkts. 320–23 ("Trial Tr."); and stipulated facts set forth in the Parties' Stipulation and Pre-Trial Order, Dkt. 309 ("PTO"). The parties called the following fact witnesses: Michael Barth (COR Clearing Chief Risk Officer) (by video), Gregory Garrabrants (Axos Financial CEO), Andrew Micheletti (Axos Financial CFO), Carlos Salas (COR Clearing CEO), Jeff Sime (COR Clearing President) (by video), and John Tolla (Axos Financial Chief Risk Officer). The parties called the following expert witnesses: Jeffrey Abramczyk (Axos Risk Expert), Colleen Diles (COR Clearing FINRA Expert), Craig McCann (COR Clearing Securities Trading and Economics Expert), and Thomas Selman (COR Clearing FINRA Expert). The parties submitted the deposition transcripts of the live witnesses and called the following witnesses by deposition only: Eshel Bar-Adon (Axos Financial Chief Legal Officer), George Lindner (Spartan Senior Trader), Ron Pitters (Axos Bank Chief Information Officer), David Lopez (Spartan Chief Compliance Officer), Steven Sugarman (COR Securities Holdings CEO), and Derrick Walsh (Axos Financial Chief Accounting Officer). The transcripts of the witnesses' respective depositions are cited using the witnesses' last names and "Dep. Tr." If a witness sat for multiple days of deposition, the day is identified (e.g., "Day 1"). The decision also notes in citation form where a witness was designated to testify under Rule 30(b)(6).

2

Most IBDs that work with Clearing "trade through" the Company, which means that the IBDs use Clearing's services to execute transactions. Trades through Clearing are routed through "Beta," Clearing's centralized order management system.[2] Beta allows the Company to monitor and block trades using pre-trade controls.[3]

Some IBDs "trade away" from Clearing, which means that they maintain their own relationships with execution centers and execute trades directly with those firms.[4] IBDs that trade away provide their completed transactions to Clearing for settlement.[5] Having IBD customers that trade away introduces risk for Clearing. Because IBDs that trade away from Clearing use their own order management systems, Clearing lacks the ability to directly monitor the trades through its own system.[6] Yet Clearing must settle the trades.[7]

Before the merger, Clearing's risk department consisted of three employees.[8] The risk department required IBDs that traded away to give Clearing administrative access to their order management systems if available, which allowed Clearing to monitor the IBD's pre-trade controls.[9]

---

[2] PTO ¶¶ 6–7; Trial Tr. at 436:5–7 (Garrabrants).

[3] Trial Tr. at 46:11–22, 47:11–48:4 (Tolla).

[4] PTO ¶ 6.

[5] *Id.* ¶ 6.

[6] Sime Day 1 Dep. Tr. at 21:1–6.

[7] *Id.* at 21:7–12.

[8] Trial Tr. at 772:8–12, 801:10–14 (Salas).

[9] JX-8 at 1.

The risk department monitored trade-away activity using two systems that assessed trading activity relative to size limits set by Clearing for each IBD: the NASDAQ ACT Risk Monitoring ("ACT") system and the Depository Trust & Clearing Corporation ("DTCC") system. The ACT system monitors individual trades, alerting clearing firms if an unsettled transaction exceeds an established size limit.[10] The DTCC system monitors the trading size of IBDs on an aggregate basis.[11] Both systems monitor trading in terms of notional value—the market price of the stock at the time of purchase, multiplied by the number of shares in the position.[12] This means that the systems monitor the market-facing value of the position. They do not account for leverage or consider margin requirements set for IBD customers.[13] The ACT and DTCC systems are post-trade monitoring systems; they issue alerts after transactions are completed.[14]

The risk department also received intraday "drop copies,"[15] or real-time reports generated by an IBD's order-management system. For executed trades, drop copies provide the quantity, price, the number of shares, and the exchange where the trade

---

[10] *Id.* at 556:6–17 (Abramczyk).

[11] Sime Day 1 Dep. Tr. at 35:4–6.

[12] Trial Tr. at 43:16–44:1, 77:13–78:9 (Tolla).

[13] *Id.*; *id.* at 556:3–557:7 (Abramczyk).

[14] *Id.* at 43:18–22 (Tolla); JX-188, at 2.

[15] Trial Tr. at 94:2–95:4 (Tolla).

was executed.[16] Drop copies do not report on a trade's impact on the IBD's aggregate activity and risk profile.[17]

Each of the reports received by Clearing provided inputs for a risk assessment, which was ultimately conducted manually. In this way, Clearing's risk-management system depended on Clearing's small risk team. Clearing's risk employees would monitor risk events and, using their professional judgment, escalate matters to senior management on a discretionary basis.[18] Carlos Salas, Clearing's CEO before the merger, was in constant contact with Clearing President Jeffrey Sime on sizable risk events that had been escalated to senior management.[19]

Along with the risk team, Clearing had a credit and risk committee that met weekly to review Clearing's relationships with IBD customers. Risk employees collected materials for review by the credit and risk committee, including Company interactions with an IBD client and regulatory actions taken against the IBD.[20] The committee reviewed a subset of IBD customers each week with the goal of reviewing every customer once annually.[21] The committee also met ad hoc to address sensitive events.[22] The committee was empowered to make adjustments to Clearing's

---

[16] *Id.* at 550:9–551:2 (Abramczyk); *id.* at 94:8–9 (Tolla).

[17] *Id.* at 772:8–12, 801:10–14 (Salas).

[18] *Id.* at 801:15–802:5 (Salas); *see also id.* at 826:21–827:7, 828:14–22 (Salas).

[19] *Id.* at 802:6–11 (Salas).

[20] *Id.* at 751:23–752:10 (Salas).

[21] *Id.* at 751:3–17 (Salas).

[22] *Id.* at 750:13–751:7 (Salas).

5

relationship with an IBD, which could include raising deposit requirements, lowering trading limits, and terminating the relationship.[23]

When warranted, Clearing could take immediate action to stop a trade-away IBD's activity. Clearing could call the market center that executes the trades to terminate sponsorship of the customer firm.[24] Clearing could call the IBD's own order management system operator and notify it that the IBD's orders are not authorized.[25] Or Clearing could immediately halt the activity by using Clearing's administrative access to the IBD's order management system and hitting the "kill switch." The kill switch allowed Clearing to shut down trading for a specific position or a specific trader.[26]

Clearing could also reduce its exposure to an IBD's trading by buying itself out of a risky position. If Clearing's risk managers or senior leadership felt that Clearing was overexposed to a short position, Clearing could buy stock to balance its exposure.[27]

Clearing issued margin calls to manage risk. Clearing's IBD customers maintain accounts with Clearing intended to cover their trading positions.[28] Based

---

[23] *Id.* at 752:11–753:10 (Salas).

[24] *Id.* at 749:2–19 (Salas).

[25] *Id.* at 666:10–14 (Abramczyk); *id.* at 746:22–748:8 (Salas); Sime Day 2 Dep. Tr. at 211:1–9.

[26] JX-8 at 1; Trial Tr. at 47:23–48:11, 74:7–19 (Tolla).

[27] Salas Rule 30(b)(6) Dep. Tr. at 106:9–108:6, 111:20–113:3.

[28] Trial Tr. at 35:2–36:16 (Tolla).

6

on price movements of a trading position's underlying security, Clearing requires IBDs to either add additional funds to its account with Clearing or reduce its trading position.[29] If the IBD does not respond to a margin call, Clearing could close the position.[30] Clearing issues margin calls before an IBDs' trading exposure exceeds the funds in its account.[31]

Of course, Clearing also receives margin calls from the market centers based on the trading positions of its IBD customers. Clearing is independently obligated to fund those calls irrespective of the IBD's response.[32] This creates liquidity risk for Clearing.[33]

In sum, Clearing maintained a small risk department that relied on a handful of reports and human decision-making to identify and escalate trading risks. For the most part, this system worked. Clearing never suffered a significant trading loss in the seven years that Salas led Clearing.[34]

## B. FINRA Recommends Changes To Clearing's Trade-Away Risk-Management Procedures.

FINRA conducts annual cycle examinations of FINRA-regulated businesses like Clearing to ensure compliance with FINRA rules and federal securities laws.[35]

---

[29] *Id.* at 764:19–765:2 (Salas).

[30] *Id.* at 759:5–11 (Salas).

[31] *Id.* at 764:19–765:2, 758:1–6 (Salas).

[32] *Id.* at 765:3–8 (Salas).

[33] *Id.*

[34] *Id.* at 698:20–23, 702:11–24 (Salas).

[35] JX-160 at 1.

FINRA also conducts "cause" examinations on an event basis, such as after a trading loss or customer complaints.[36]

After an examination, FINRA may issue a report with exceptions and recommendations for the FINRA member.[37] The report requires a response from the member firm discussing how the firm will address the exceptions noted in the report, and FINRA then resolves the matter through an "Examination Disposition Letter."[38] There are three types of Examination Disposition Letters: "No Further Action" letters, which FINRA issues when it does not find a violation; "Cautionary Action" letters, which FINRA issues to warn a member firm that a similar violation may result in formal disciplinary action; and a "Compliance Conference," which is a more serious informal action that involves a meeting between FINRA and management.[39]

FINRA published the "2017 Cycle Examination" report of Clearing on March 19, 2018.[40] The report listed exceptions, where FINRA noted Clearing's non-compliance with a FINRA rule, as well as recommendations. The report recommended that Clearing increase oversight of limit breaches, noting that some trade-away transactions were not adequately "review[ed,] approv[ed]" or "escalat[ed] to senior management."[41] The report's recommendations raised concerns regarding

---

[36] Trial Tr. at 895:12–24 (Diles).

[37] JX-163 at 7.

[38] *Id.*

[39] *Id.*

[40] JX-35.

[41] *Id.* at 5–6.

8

the absence of real-time monitoring of certain IBDs trading away.[42]  The report also suggested that Clearing document the reason for credit limits higher than what Clearing's policies proscribed.[43]

The Company responded to the FINRA report on May 4, 2018.  The response stated that the Company had "amended its procedures to incorporate the recommendations detailed" by FINRA addressing trade-away IBDs.  The response identified three changes in Company procedure and policy.

First, the Company implemented "new procedures for review and approval of . . . limit breaches" that generated DTCC alerts.[44]

Second, the Company began designing a new risk monitoring system:

> . . . COR is designing a new risk monitoring system which includes, among other things, risk monitoring displays that focus on certain correspondent customer balances and activities.  These risk monitoring systems will use real-time execution or NSCC clearing record drop copies to display in real-time records that measure key balances and activity.  These risk tools will provide broad monitoring of all correspondent customers whether they trade away or trade through COR's systems.[45]

Third, the Company "created a process to document the review and approval of trading limits."[46]

---

[42] *Id.*

[43] *Id.* at 7.

[44] JX-19 at 6; Barth Dep. Tr. at 42:17–24.

[45] JX-19 at 6.

[46] *Id.*

9

FINRA sent a Cautionary Action letter to Clearing on May 14, 2018 (the "2018 Cautionary Action Letter").[47] As to the exceptions in the report, the letter cautioned Clearing of its "violations of securities rules and regulations," and warned that if a repeat violation occurred, FINRA would consider the 2018 Cautionary Action Letter when deciding what action to take.[48] But the letter also stated that the Company did not need to disclose the letter in the Company's public registration filings, and that FINRA's decision "not to take action" should have no "evidentiary weight in any mediation, arbitration, or judicial proceeding."[49]

## C. Axos Offers To Acquire Clearing.

Axos became interested in acquiring Clearing in 2015 and began conducting diligence into Clearing in August 2017.[50] That month, Clearing CEO Salas and Clearing President Jeff Sime met with Axos representatives. Axos Financial's Head of Risk, John Tolla, led the diligence effort into compliance and risk management.[51] Axos Financial's CFO, Andrew Micheletti, and Chief Accounting Officer, Derrick Walsh, led financial diligence.[52]

Moelis & Company advised Clearing in the sale process. Moelis prepared a confidential information presentation, or "CIM," that discussed Clearing's trade-

---

[47] JX-36.

[48] *Id.* at 2.

[49] *Id.*

[50] Garrabrants Rule 30(b)(6) Dep. Tr. at 47:17–48:4.

[51] Trial Tr. at 132:8–10 (Tolla).

[52] *See* JX-148, at 1; Walsh Dep. Tr. 19–25; Trial Tr. at 371:6–12 (Garrabrants).

away IBDs.[53] Clearing provided the CIM to Axos during an August 2017 meeting.[54] In addition to the detail provided in the CIM, Salas and Sime told Axos that Clearing examined trade-away IBDs' order management systems to ensure they enforced daily trade limits and maintained administrative access to trade-away IBDs' order management terminals.[55]

On October 2, 2017, Axos issued a non-binding proposal to acquire Clearing.[56] The proposal listed the following three areas as "remaining due diligence items": (i) technology and infrastructure; (ii) regulatory and legal; and (iii) financial and accounting.[57] Remaining diligence items in the technology and infrastructure category comprised: "[l]ist of IT projects – ongoing and projected over the next 24 months – including costs, staffing and projected completion dates; [p]rocess and procedures for IT development projects; [r]eview of software code and custom software and hardware integrations."[58] The offer did not specifically identify risk management as a topic for remaining diligence.

---

[53] Trial Tr. at 391:10–22 (Garrabrants); *id.* at 728:3–7 (Salas); JX-18 at 57.

[54] Trial Tr. at 291:3–16 (Micheletti); JX-18 at 57.

[55] Trial Tr. at 141:6–17 (Tolla); *id.* at 292:3–293:21, 294:16–295:22 (Micheletti); JX-18 at 57.

[56] JX-14.

[57] *Id.* at 2.

[58] *Id.* at 5.

**D.  Axos Conducts Diligence.**

**1.  Clearing's Risk-Management System**

Axos's diligence of Clearing began in earnest in early 2018.[59] At the start of diligence, Axos Financial CEO Gregory Garrabrants tasked Tolla with assessing Clearing's compliance and risk management and alerted Tolla to the elevated risk profile of IBD customers that traded away.[60]

Tolla conducted diligence on Clearing's order management systems and controls.[61] Tolla went to Clearing's Omaha headquarters several times for diligence matters. He conducted firsthand tests on Beta when there.[62] Tolla did not conduct tests on any systems for IBDs that traded away from Clearing. According to Tolla, the Clearing team told him that the Company had administrative access to the order management systems of IBDs that traded away,[63] and the Axos team continued to discuss the August 2017 Moelis CIM with Clearing.[64]

Clearing provided the contents of the 2017 Cycle Examination report, Clearing's response, and the 2018 Cautionary Action letter to Tolla during diligence.[65]

---

[59] *See* Trial Tr. at 185:19–186:7 (Tolla).

[60] *Id.* at 132:8–17 (Tolla).

[61] *Id.* at 185:3–6 (Tolla).

[62] Trial Tr. at 133:4–6, 193:21–194:18 (Tolla); *id.* at 435:23–436:10 (Garrabrants).

[63] *See, e.g.*, Trial Tr. at 142:9–11 (Tolla).

[64] *Id.* at 285:14–16 (Micheletti), *id.* at 391:10–21 (Garrabrants); Tolla Dep. Tr. at 42:7–11.

[65] PTO ¶ 11.

12

And Tolla reviewed these materials.[66] He asked about the Company's response in diligence calls and meetings with Mark Bell, then-Chief Legal & Compliance Officer of Clearing, and Efren Cleofe, a member of Bell's team.[67] According to Tolla, Bell and Cleofe confirmed that Clearing's responses were accurate and that the project to "design a new risk monitoring system" was completed.[68]

After completing diligence, Tolla recommended the merger to Axos. He felt that the risk-management system was "well-configured" and compliance oversight of IBDs was "adequate."[69]

### 2. The Barth Plan

In response to FINRA's 2017 Cycle Examination, Clearing hired Michael Barth as its Chief Risk Officer in March 2018.[70]

Barth sent proposals for improving Clearing's risk-management system to Sime on May 2, 2018, two days before Clearing responded to FINRA's examination report. Barth's proposals included moving Clearing to a real-time monitoring system by using intraday drop copies and implementing a pre-trade risk gateway that could

---

[66] Trial Tr. at 142:24–143:11, 146:9–19, 189:3–10 (Tolla).

[67] *See* JX-18.

[68] *Id.* at 148:1–21, 149:13–150:9 (Tolla).

[69] *Id.* at 169:14–170:2 (Tolla).

[70] Barth Dep. Tr. at 22:1–5; JX-37 at 2.

stop trades from a third party based on aggregate risk inputs.[71] Barth emphasized the importance of transitioning to real-time monitoring in his proposal.[72]

Clearing took no action on Barth's proposal until late November 2018 (after executing the merger agreement but before closing) when Barth was authorized to hire a vendor to implement the IT components of his proposal.[73] Barth felt like he was "being blown off."[74]

### E.   Axos Acquires Clearing.

On September 28, 2018, Legent Group, LLC, COR Securities Holdings Inc., COR Advisors LLC, St. Cloud Capital Partners II, L.P., and Carlos P. Salas (together, "Sellers") agreed to sell the Company to Axos Clearing, LLC and Axos Clarity MergeCo., Inc. (together, "Buyers"), under an Agreement and Plan of Merger (the "Merger Agreement").[75] The transaction (the "Merger") closed on January 29, 2019 (the "Closing Date").[76]

Buyers paid $80 million in cash for Clearing.[77] Buyers withheld $7.5 million of the sale price in the form of subordinated notes issued to Buyers by Axos Financial,

---

[71] JX-37 at 2; Trial Tr. at 126:8–16, 248:13–18 (Tolla); *id.* at 471:22–472:8 (Garrabrants).

[72] JX-38.

[73] Barth Dep. Tr. at 104:10–15; JX-41.

[74] Barth Dep. Tr. at 100:16–18.

[75] JX-9 ("Merger Agr."); JX-11.

[76] PTO ¶ 10.

[77] Merger Agr. § 2.2(a).

14

Inc. ("Notes").[78]  A subordinated loan agreement set the terms of the Notes.[79]  Under the Merger Agreement, the Notes are Buyers' sole source of recovery for an indemnification claim.[80]

Article 8 of the Merger Agreement provides that Sellers will indemnify Buyers' entities (defined in the Merger Agreement as "Parent Indemnified Parties") for "any and all damage . . . arising out of or resulting from . . . the failure of any of the representations or warranties of Company set forth in Article III to be true and correct" at signing or closing.[81]

Two Article III representations are relevant to this litigation.  Section 3.12(a) represents that the Company "has complied in all material respects with all applicable Laws and Orders" (the "Legal-Compliance Representation").[82]  Article 3.13(b) represents that, for Clearing's "Material Contracts," "there exists no default or event of default or event, occurrence, condition or act . . . to the Knowledge of the Company, with respect to any other contracting party, which . . . would become a default or event of default[.]" (the "Counterparty-Breach Representation").[83]  This decision quotes both provisions in the legal analysis.

---

[78] *Id.* § 2.4.

[79] JX-12.

[80] PTO ¶ 5; Merger Agr. §§ 8.2(a), 8.5(d).

[81] Merger Agr. § 8.2.

[82] *Id.* § 3.12(a).

[83] *Id.* § 3.13(b).

The Merger Agreement also contains an anti-reliance provision—a representation by Buyers stating that they did not rely on any representations Sellers made other than those in the Merger Agreement.[84]

### F.  Axos Removes Clearing's CEO.

The Merger closed on January 28, 2019, and Clearing became Axos Clearing.[85] Salas agreed to remain Clearing's CEO for a six-month transition period.[86]  But during the last week of February 2019, Garrabrants asked Salas to resign.[87] Although Salas expressed concern about an apparent lack of transition plan, Garrabrants felt that Salas's presence was unnecessary.[88]  Axos did not immediately fill the CEO position.  President Sime reported directly to Garrabrants after Salas's departure.[89]

### G.  Clearing Incurs The Reynolds Loss.

Spartan Securities Group, Ltd. ("Spartan") was one of Clearing's trade-away IBDs.[90]  An April 8, 2013 agreement governed the relationship between Spartan and Clearing (the "Spartan Agreement").[91]  The Spartan Agreement placed "exclusive responsibility" on Spartan for compliance with the agreement and all applicable SEC

---

[84] *Id.* § 4.10.

[85] JX-11.

[86] JX-13 at 2.

[87] Trial Tr. at 792:22–793:4 (Salas).

[88] *Id.* at 461:21–462:10 (Garrabrants); *id.* at 793:14–23 (Salas).

[89] Trial Tr. at 460:17–461:15 (Garrabrants).

[90] PTO ¶ 9; JX-6.

[91] JX-6.

16

and FINRA rules.[92] Spartan represented that it would maintain compliance with all applicable net capital requirements.[93]

The Spartan Agreement incorporated by reference an inventory lending agreement that established trading limits.[94] Spartan also imposed internal limits on its traders, but Spartan primarily relied on human oversight of trading activity to enforce both the contractual and internal limits.[95] It is unclear whether Clearing had administrative access to Spartan's order management system.

Clearing issued margin calls to Spartan four times in 2018, including once after Clearing signed the Merger Agreement.[96] It was not unusual to issue margins calls to IBDs at this frequency.[97]

On March 6, 2019, Scott Reynolds, a principal at Spartan, acquired a short position in BioPath Holdings, Inc., a microcap biotech security. After Biopath's stock price rose unexpectedly, Reynolds got caught in what is called a "short squeeze"—a situation where a trader must close their short position on a security in response to a sudden and unexpected increase in the security's price. Reynolds did not do so. Instead, Reynolds doubled down and increased his short position. Reynolds tried to

---

[92] JX-6 §§ 2.1.6, 3.4.

[93] *Id.*

[94] *Id.* § 2.1.6; JX-107 at 15.

[95] *See, e.g.*, JX-102 at 1–2; *see also* Lopez Dep. Tr. at 57:18–58:24, 99:18–100:17; Lindner Dep. Tr. at 37:24–38:18.

[96] JX-26; JX-28; JX-29; JX-30.

[97] Trial Tr. at 204:22–205:20 (Tolla); *id.* at 758:15–19 (Salas).

17

cover up the exposure by creating a "wooden ticket"[98]— a strategy involving fictitious

trade entries that looked like they would close his position out. The events unfolded

as follows:

- In the morning of March 6, 2019, Reynolds had a marked-to-market short position of -$9,264.[99]

- Before the market opened on the morning of March 6, 2019, Reynolds increased his short position to -$1,046,570.[100] Reynolds began spoofing the Spartan system by acquiring long positions and quickly cancelling them.[101] It thus appeared to Spartan that he was shrinking his short position.[102] Before the market opened, Reynolds's true short position exceeded Spartan's trading limits.[103]

- By 9:30 a.m. ET when the market opened, Reynolds had a marked-to-market position of -$1,747,005.[104]

- By 10:15 a.m. ET, Reynolds had a marked-to-market position of -$3,012,635. By this time, employees at Spartan had become aware that Reynolds was concealing his true short position and David Lopez, Spartan's Chief Compliance Officer, resolved to close out Reynolds's position the next day.[105]

- By 11:00 a.m. ET, Reynolds had a marked-to-market position of -$5,659,822.[106] Lopez began texting Reynolds about the short position. He urged Reynolds to close out the position because Spartan did not

---

[98] Lindner Dep. Tr. at 39:6–43:14.

[99] JX-158 at 50; JX-22 at 7. The position is "marked-to-market" by multiplying the net shares in the position by the market price of the security. JX-158 at 50.

[100] JX-158 at 50.

[101] Trial Tr. at 221:4–24 (Tolla).

[102] Lindner Dep. Tr. at 38:25–42:15.

[103] JX-158 at 32.

[104] *Id.* at 50.

[105] Lindner Dep. Tr. at 42:9–46:17.

[106] JX-158 at 50.

have the capital to support it. Reynolds assured him the position would recover.[107]

- At 11:09 a.m. ET, Clearing's ACT system generated an alert informing Clearing that Spartan was approaching or exceeding 70% of its proscribed notional value limit.[108] Spartan's limit was $10 million, so the alert informed Clearing that Spartan's position exceeded $7 million in notional value. It is unclear whether any employee at Clearing viewed the alert when it issued. Clearing took no action at this time.[109]

- By 11:45 a.m. ET, Reynolds had a marked-to-market position of -$7,899,596.[110]

- By 12:30 p.m. ET, Reynolds had a marked-to-market position of -$11,440,460.[111] Around that time, Clearing's DTCC system generated an alert stating that Spartan had surpassed a net notional value of $7.5 million.[112] Clearing's risk team had reviewed the DTCC alert when it issued. By that time, they had also reviewed the ACT alert.[113]

- At 1:07 p.m. ET, the DTCC system's settlement arm, National Securities Clearing Corporation, issued a margin call to Clearing for over $3 million.[114] Clearing's treasury department wired the funds to National Securities Clearing Corporation and notified management of the wire.[115]

- By 1:15 p.m. ET, Reynolds had a marked-to-market position of -$11,365,734.[116] Sometime between 1:07 p.m. ET and 1:54 p.m. ET,

---

[107] JX-99 at 1–2.

[108] JX-22 at 7; JX-158 at 50.

[109] JX-22 at 7, Trial Tr. at 107:17–108:5 (Tolla).

[110] JX-158 at 50.

[111] *Id.*

[112] JX-22 at 7.

[113] *Id.*

[114] *Id.*; Trial Tr. at 108:10–109:3 (Tolla).

[115] JX-22 at 7.

[116] JX-158 at 50.

19

Clearing's risk team escalated the matter to Chief Risk Officer Barth and President Sime.[117]

- By 1:45 p.m. ET, Reynolds had a marked-to-market position of -$10,552,954.[118] Minutes later, Clearing's risk team contacted Spartan for the first time. The Clearing team demanded that Spartan close Reynolds's position.[119]

- By 2:00 p.m. ET, Reynolds had a marked-to-market position of -$9,114,459.[120] Five minutes later, Reynolds responded to Clearing on behalf of Spartan, stating that Spartan would cover a majority of the position. Over the next two hours, Spartan worked on covering the short before market close.[121] Clearing did not take further action outside of receiving updates from Spartan.[122]

- By market close at 4:00 p.m. ET, Reynolds had a marked-to-market position of -$7,789,035.[123] Spartan told Clearing that it had been unable to cover the short and would continue to try to buy Biopath shares during extended hours trading.[124]

- The following morning around market open, Sime contacted Garrabrants, asking if Clearing should close Spartan's position or wait for Spartan to close the position itself.[125] Garrabrants said he would need to think about it and did not instruct Sime to close Reynolds's position.[126] But Biopath's stock price had risen overnight.[127] Trading became so volatile on March 7 that NASDAQ paused trading of Biopath 15 times.[128] Spartan managed to close out Reynolds's position by 1:30

---

[117] JX-22 at 7; Sime Day 2 Dep. Tr. at 112:7–114:4; Barth Dep. Tr. at 117:19–119:12.

[118] JX-158 at 50.

[119] JX-22 at 8; Trial Tr. at 109:15–23 (Tolla).

[120] JX-158 at 50.

[121] JX-22 at 8.

[122] JX-99 at 3.

[123] JX-158 at 50.

[124] JX-22 at 8.

[125] Sime Day 1 Dep. Tr. at 252:2–9.

[126] Sime Day 2 Dep. Tr. at 118:5–19.

[127] JX-22 at 10; Sime Day 2 Dep. Tr. at 117:21–22.

[128] JX-22 at 10.

p.m. ET. At no point did anyone at Clearing instruct employees to close out Spartan's position.[129]

In the end, Clearing suffered a loss of $16.6 million.[130] Spartan covered $1.4 million of the loss, leaving a net loss of $15.2 million (the "Reynolds Loss").[131] For the Company to maintain sufficient net capital, Axos Financial had to wire $15 million to Clearing.[132]

### H. FINRA Issues A Cautionary Action Letter Regarding Clearing's Risk-Management System.

Following the Reynolds Loss, FINRA conducted a cause examination at Clearing (the "2019 Cause Examination").[133] FINRA issued a report on November 26, 2019, with an exception stating that Clearing "was not in compliance with" FINRA Rule 3110 and FINRA Rule 4210(d).[134]

On January 10, 2020, Clearing provided a written response to the 2019 Cause Examination report disputing FINRA's findings.[135] Clearing argued that the report "fail[ed] to take into account the fact that the loss was the result of a fraud perpetrated by Scott Reynolds . . . which was accomplished by his intentional circumvention of [] Clearing's controls[.]"[136] Despite Reynolds's fraud, Clearing

---

[129] Sime Day 2 Dep. Tr. at 118:20–21; Barth Dep. Tr. at 119:7–12.

[130] JX-158 at 3.

[131] *Id.*

[132] Trial Tr. at 313:14–314:16 (Micheletti); JX-23.

[133] JX-2.

[134] *Id.* at 3.

[135] JX-3 at 1.

[136] *Id.* (emphasis omitted).

21

maintained that its "controls, including its intraday controls were adequate on March 6, 2019."[137] Clearing also expressed its commitment to "enhanc[ing]" its risk controls and described plans for strengthened pre-trade risk procedures, comprehensive intraday trade monitoring, and decreased limits for IBDs that trade away.[138]

In response, FINRA sent the Company an Examination Disposition Letter on February 11, 2020 (the "2020 Cautionary Action Letter"), which was substantively similar to the 2018 Cautionary Action Letter.[139]

### I.    Axos Demands Indemnification.

Four months after the Reynolds Loss, Buyers tendered a demand for indemnification to Sellers, alleging a breach of the Legal-Compliance Representation, the Counterparty-Breach Representation, and a representation regarding net capital that is not at issue. The demand stated that Sellers breached the representations by causing the Company to violate FINRA rules and by failing to disclose Spartan's existing default on the Spartan Agreement.[140]

### J.    A FINRA Arbitration Panel Finds Reynolds Solely Responsible For The Reynolds Loss.

On August 13, 2019, Clearing brought FINRA arbitration claims against Reynolds for fraudulent misrepresentation, negligent misrepresentation, fraudulent

---

[137] *Id.* at 6 (cleaned up).

[138] *Id.* at 6–7.

[139] JX-4 at 1; *see* JX-36.

[140] JX-201.

failure to disclose, tortious interference, breach of contract, and unjust enrichment.[141] In the arbitration, Clearing took the position that it had the ability to close out Reynolds's position but relied on Reynolds's promise that he would close out the position.[142] In May 2021, the FINRA panel found Reynolds "solely responsible" for the Company's losses and ordered Reynolds to pay over $17 million to Clearing.[143] As of the trial date, this sum had not been paid.

### K. Sellers File This Litigation.

The Notes became due and payable on April 28, 2020.[144] When the outstanding sums were not paid, Sellers filed this suit on May 27, 2020, seeking a declaratory judgment that: (1) they do not have a duty to indemnify Buyers under the Merger Agreement; (2) there is no basis to reduce principal due under the Notes; and (3) Axos must pay the outstanding principal under the Notes.[145] Sellers also sought damages for the amount of allegedly unpaid principal under each Note, plus costs and attorneys' fees.[146] The court denied Buyers' motion to dismiss Sellers' declaratory judgment claim but dismissed Sellers' claims for damages under the Notes for lack of subject-matter jurisdiction based on the Notes' arbitration provisions.[147]

---

[141] JX-232 at 24–32; JX-106 at 2.

[142] JX-236 at 4204:23–4205:16.

[143] JX-106 at 8.

[144] JX-12 § 1(a).

[145] Dkt. 1.

[146] *Id.* at 19–25.

[147] Dkt. 30.

Sellers amended their complaint on February 17, 2021 to remove the counts over which the court lacked subject matter jurisdiction.[148] On March 12, 2021, Buyers filed an answer and asserted a counterclaim for declaratory relief.[149] The court granted Sellers' motion for leave to file a Second Amended Complaint over Buyers' opposition.[150] Sellers filed the Second Amended Complaint on October 12, 2021.[151]

The Second Amended Complaint contains two counts: In Count I, Sellers seek three declarations: First, Sellers have no duty to indemnify Clearing and Buyers. Second, there is no basis to reduce principal due under the Notes. And third, Axos must make full payment of the outstanding principal under the Notes. In Count II, Sellers claim that Buyers breached Section 8.2(a) of the Merger Agreement by wrongfully asserting their indemnification demands.[152]

Buyers moved to dismiss and strike the Second Amended Complaint on October 26, 2021.[153] Sellers moved for judgment on the pleadings with respect to Buyers' counterclaim, arguing that findings in the FINRA arbitration stating that Reynolds was solely responsible for Clearing's losses collaterally estopped Buyers' arguments here.[154] On July 11, 2023, the court dismissed the claim in Count II

---

[148] Dkt. 38.

[149] Dkt. 42.

[150] Dkt. 109.

[151] Dkt. 118 at 35.

[152] *Id.* at 36–37.

[153] Dkt. 124.

[154] Dkt. 94.

against Axos Financial, Inc. and otherwise denied the motion to dismiss.[155] The court denied the motion for judgment on the pleadings.[156]

Sellers did not press Count II as to Axos Securities and Buyers did not expressly pursue their counterclaim, which sought mirror-image relief to that requested by Sellers. The parties went to trial on Count I of the Second Amended Complaint.

The court held a four-day trial from April 29, 2024 through May 2, 2024. The parties completed post-trial briefing on January 17, 2025,[157] and the court heard post-trial argument on May 8, 2025.[158]

## II. LEGAL ANALYSIS

The parties' post-trial dispute centers on whether Buyers are entitled to indemnification. Subject to a basket not implicated at this stage, Sellers agreed in Section 8.2(a) of the Merger Agreement to indemnify Buyers:

> for any and all damage, loss and expense . . . to the extent actually suffered or incurred by a Parent Indemnified Party arising out of or resulting from [] the failure of any of the representations or warranties of Company set forth

---

[155] Dkt. 191.

[156] Dkt. 191; *see* Dkt. 194 at 29:11–14, 35:18–23.

[157] Dkt. 355.

[158] Dkt. 364. On the eve of trial, Sellers filed an emergency motion to compel the production of the FINRA arbitration transcripts and documents that Buyers had previously stated were protected from discovery because they were confidential. Dkt. 316. After trial, Sellers filed a motion for sanctions due to Buyers' discovery conduct. The court resolves the sanctions motion in a separate letter decision.

> in Article III to be true and correct on June 1, 2018 or at
> and as of the Closing Date[.][159]

For a representation to give rise to indemnification under Section 8.2(a), it must have been inaccurate as of June 1, 2018, or the January 29, 2019 Closing Date, and it must be the cause ("arising out of or resulting from") of the damages, loss, or expense actually incurred.

Buyers argue that neither the Legal-Compliance Representation nor the Counterparty-Breach Representation were true and correct as of the Closing Date.[160] Buyers further argue that each inaccuracy was an independent cause of the Reynolds Loss.

Buyers bear the burden of proving that the representations on which they rely were inaccurate when the Merger closed.[161] They also bear the burden of proving causation.[162]

The court's task is to interpret the Merger Agreement in a way that carries out the parties' intent.[163] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[164] The contract terms will be given

---

[159] Merger Agr. § 8.2(a).

[160] *Id.*

[161] *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *49 (Del. Ch. Nov. 30, 2020), *aff'd,* 268 A.3d 198 (Del. 2021).

[162] *Id.*

[163] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[164] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (quoting *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014)).

"plain, ordinary meaning."[165] "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan."[166] The court must "reconcile all the provisions of the instrument" if possible.[167]

## A. Legal-Compliance Representation

Section 3.12(a) of the Merger Agreement states, in relevant part:

> Except as set forth in Section 3.12(a) of the Disclosure Schedule, since June 30, 2015, Company and each of its Subsidiaries . . . has complied in all material respects with all applicable Laws and Orders . . . .[168]

This language contains the Legal-Compliance Representation—that, since June 30, 2015, Clearing has complied in all material respects with all applicable Laws and Orders. Again, to support Buyers' claim for indemnification, the Legal-Compliance Representation must be inaccurate as of the Closing Date. This language also contains a carveout: "[e]xcept as set forth in Section 3.12(a) of the Disclosure Schedule" (the "Carveout"). The phrase "except as set forth" indicates that the Legal-Compliance Representation does not cover items in Section 3.12(a) of the Disclosure Schedule.

---

[165] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (citing *City Investing Co. Liquid. Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)).

[166] *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985); *accord. HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, 2020 WL 3620220, at *6 & n.40 (Del. Ch. July 2, 2020); *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *50 & n.648 (Del. Ch. Dec. 3, 2018).

[167] *Elliott Assocs. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

[168] Merger Agr. § 3.12(a).

To prevail on their Legal-Compliance Representation theory, therefore, Buyers must prove both that Clearing was in violation of "Laws and Orders" on the Closing Date and that the violation is not covered by the Carveout. Buyers have proven neither.

### 1. The Representation

"Laws and Orders" include FINRA rules,[169] and Buyers claim that Clearing violated two FINRA Rules: Rule 3110 and Rule 4210(d).[170] As of the Closing Date, Rule 3110 required that each FINRA member firm have a system that is "reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules."[171] Rule 4210(b) established specific requirements for new transactions, requiring that members establish procedures to: "(1) review limits and types of credit extended to all customers; (2) formulate their own margin requirements; (3) review the need for instituting higher margin requirements, mark-to-markets and collateral deposits than are required by this Rule for individual securities or customer accounts."[172] Read together, FINRA Rules 3110 and 4210(b) require that a clearing firm's risk system be reasonably designed to achieve compliance with FINRA rules, including Rule 4210(b).[173]

---

[169] *See id.* § 3.3(b).

[170] Defs.' Post-Trial Opening Br. at 8; *see also* JX-166; JX-167.

[171] JX-167 at 1.

[172] JX-166 at 5.

[173] Sellers deny that these rules should be read together in this way. Pls.' Post-Trial Opening Br. at 48–51. But the language of the FINRA rules is unambiguous.

The "reasonably designed" standard affords clearing firms a great deal of flexibility in designing their risk system. As Buyers acknowledged in briefing, there is no "precise set of controls that *must* be in place."[174]

Sellers called individuals who worked at Clearing before the Closing Date who credibly testified about aspects of Clearing's compliance. Chief Risk Officer Barth, whom Buyers describe as a "highly credible" and "neutral" witness, testified several times that the risk systems at issue complied with FINRA rules.[175] CEO Salas testified that Clearing engaged industry-leading consulting firms to evaluate Clearing's controls and propose changes (which were implemented).[176] According to Salas, at the time of the Merger, Clearing's controls were "technology solutions that were broadly accepted in the industry," and were "good controls" for "a clearing firm of [Clearing's] size."[177]

Sellers also relied on evidence of FINRA's 2017 Cycle Examination, which found no rule violations relevant to Buyers' claims.[178] Sellers further note that even Buyers contended that Clearing's system complied with applicable regulations when

---

[174] Defs.' Post-Trial Opening Br. at 14 (emphasis in original); *see also* Trial Tr. at 902:12–17 (Diles); *id.* at 1075:18–1076:12 (Selman).

[175] Barth Dep. Tr. at 57:9–15, 127:16–128:4.

[176] Trial Tr. at 719:22–722:4 (Salas).

[177] *Id.* at 767:15–23 (Salas); *see also* Sime Day 2 Dep. Tr. at 195:20–24 (testifying that there was no violation of FINRA rules).

[178] JX-35.

it was convenient for them, describing Clearing's compliance in a letter to FINRA dated January 10, 2020.[179]

In the face of this general evidence of compliance, Buyers proffer a more specific definition of "reasonable." Buyers say that, at a minimum, a reasonably designed risk system must contain an appropriate "mix of preventative, detective, and responsive controls and procedures" for extending credit to IBDs that traded away.[180] Buyers further argue that Clearing's risk system lacked any of the minimum requirements on the Closing Date.

Buyers rely foremost on testimony from their expert on what a reasonably designed risk system should include. They also point to FINRA's 2019 Cause Examination report and the 2020 Cautionary Action Letter, and fact testimony from Chief Risk Officer Barth detailing his proposed improvements to Clearing's risk system.

These three categories do not show, independently or taken together, that the Legal-Compliance Representation was inaccurate on the Closing Date.

### a. Expert Testimony

Buyers called Jeffrey Abramczyk to provide an expert opinion on what constitutes a reasonably designed supervisory system.[181] Abramczyk is highly

---

[179] JX-3 at 6.

[180] Defs.' Post-Trial Opening Br. at 10 (cleaned up) (citing JX-158 at 22–25); *id.* at 15.

[181] JX-158 at 3.

qualified. He has over 30 years of experience in auditing, finance, risk management, and compliance at major financial institutions, including broker-dealers.[182]

Abramczyk opined that Clearing's risk systems lacked technological and bureaucratic infrastructure. According to Abramczyk, Clearing's supervisory risk systems were inadequate in three areas: setting trading limits; monitoring trades through administrative access to order management systems; and establishing detailed procedures to respond to risk events.[183] Abramczyk testified that the four or five clearing firms that he had worked with all had those three fundamentals, though each firm had a bespoke system suited to its business.[184]

All three inadequacies Abramczyk identified at Clearing correlate to an absence of technological controls that effectively "hard-code" risk-management procedures.[185] Per Abramczyk, Clearing was not setting or enforcing trade limits and had to rely on Spartan's internal discretion in monitoring high-risk trades.[186] His proposed solution was to access IBDs' trading systems to impose and verify technological controls.[187] Clearing's reliance on alerts from the ACT and DTCC systems to monitor trading activity was insufficient, said Abramczyk, because those

---

[182] *Id.* at 11.

[183] *Id.* at 20–25; *see also* Trial Tr. at 598:14–600:7 (Abramczyk).

[184] Trial Tr. at 597:17–600:7 (Abramczyk).

[185] To "hard code" a procedure is to fully automate a process such that no human decision-making is required. *See, e.g.*, Trial Tr. at 242:3–18 (Tolla).

[186] JX-158 at 22–23.

[187] *Id.* at 23.

systems report on the notional value of trading positions. They are not tailored to margin limits or specific characteristics of certain securities or accounts.[188] So his proposed solution was to deploy additional technological controls with real-time monitoring capabilities.[189] Also, Clearing had sparse written procedures that only required that the risk department "investigate[] alerts it receive[d]" and "tak[e] action when necessary."[190] Abramczyk's faulted Clearing for not adopting additional procedures that tell risk managers what to do without relying on those managers' professional judgment.[191]

Put simply, Abramczyk opined that for a risk system to be reasonably designed, it must contain automatic technological controls to prevent or identify a limit breach. And if a limit was breached, a risk manager must automatically resolve the matter or escalate the situation under more specific written procedures.

Sellers called Thomas M. Selman and Colleen Diles to rebut Abramczyk's report. Both experts are also highly qualified. Selman served in regulatory, operations, and examination roles at FINRA for nearly 25 years,[192] and he personally participated in decisions on whether to administer letters of caution to member firms and whether to refer infractions to FINRA's enforcement department. Diles worked

[188] Trial Tr. at 556:6–17, 556:23–557:7 (Abramczyk); Sime Day 1 Dep. Tr. at 35:4–6.
[189] JX-158 at 24; Trial Tr. 599:17–24 (Abramczyk).
[190] JX-158 at 25; JX-173 at 9.
[191] Trial Tr. at 552:14–553:7, 554:10–16, 600:4–7 (Abramczyk); JX-158 at 25.
[192] JX-159 at 2.

for FINRA for over 20 years, where she led cycle examinations and cause examinations.

Selman and Diles each argued that Abramczyk erred in his assessment that a risk system like Clearing's, which prioritized human discretion and professional judgment over technological controls and bureaucracy, was unreasonable. Selman opined that Abramczyk overstated the necessity of technological controls. Selman found that some of the technologies and procedures that Abramczyk proposed would help certain clearing firms, but FINRA rules do not require them.[193] And FINRA rules contain no absolute mandates, because each clearing firm navigates a different risk environment and is only required to develop practices and procedures that are tailored to its own activities.[194] Diles discussed the "human element" of risk—even with robust technological controls, a firm's ability to emerge from a risk event unscathed depends on a "sum of decisions" by employees.[195]

Sellers' expert witnesses rebut the notion that clearing firms are required to adopt every technology and risk-management practice that is available. They can have mix of technological controls and human-dependent processes and still comply with FINRA rules.[196] Indeed, having the right mix of automated and manual controls

---

[193] *Id.* at 12.

[194] *Id.* at 11.

[195] JX-164 at 4, 6; Trial Tr. at 951:5–952:5 (Diles).

[196] *See, e.g.*, Trial Tr. at 704:12–19, 801:23–802:11, 818:9–20, 827:19–22, 828:14–22 (Salas); *id.* at 710:21–711:15, 958:2–22, 1017:8–22 (Diles).

allows clearing firms to adapt to risk events that appear in unexpected ways.[197] CEO Salas testified that "risk is a hydra": "some measure of flexibility" is required "because [clearing firms] can't understand all the risks that [they] face" at any given time.[198] This testimony was compelling.

Clearing's particular mix of controls relied substantially on the discretion of its risk employees and senior management. Abramczyk attacked this approach by identifying automated controls that could have helped Clearing, but that does not show that Clearing's mix of controls put it in violation of FINRA rules on the Closing Date.

### b. Barth Testimony

Buyers also argue that Chief Risk Officer Barth's testimony discussing his experience and proposals for Clearing demonstrate that Clearing's systems were not reasonably designed. In his deposition, Barth described the new risk system he had designed in response to FINRA's concerns from the 2017 Cycle Examination.[199] But Barth's testimony as a fact witness describes improvements that Clearing could have made but did not. Barth does not state, nor does his testimony show, that Clearing's system was not reasonably designed or that Clearing was in breach of FINRA rules.[200]

---

[197] *See id.* at 820:1–9 (Salas).

[198] *Id.* at 710:21–711:7; 820:1–9 (Salas).

[199] Barth Dep. Tr. at 43:1–44:7.

[200] Pls.' Post-Trial Answering Br. at 39; Barth Dep. Tr. at 43:1–44:10, 76:6–14.

### c. FINRA Letters

That leaves the 2019 Cycle Examination report and the resulting 2020 Cautionary Action Letter.[201] The 2020 Cautionary Action Letter states Clearing violated FINRA rules.[202] And since Clearing's risk system during the 2019 Cycle Examination was the same system deployed pre-closing, Buyers argue that Clearing was in breach on the Closing Date.[203]

Aspects of the 2019 Cause Examination report and 2020 Cautionary Action Letter help Buyers. In an exception, the report expressly states that Clearing was not compliant with FINRA Rule 3110 and FINRA Rule 4210(d). The exception's "Detail" section states:

> In a correspondent clearing relationship trade supervision rests with the correspondent broker-dealer; however, as a clearing broker the firm also has a responsibility to establish controls to prevent the endangerment of its capital. The firm's credit limits and supervisory process were not adequate to monitor credit exposure to its correspondent, Spartan Securities Group, LTD, in order to prevent the endangerment of the firm's capital.[204]

After Clearing provided a response contesting the findings, FINRA issued the 2020 Cautionary Action Letter. The letter cautions Clearing concerning the

---

[201] *See* Defs.' Post-Trial Opening Br. at 22–26.

[202] JX-2 at 3.

[203] Defs.' Post-Trial Opening Br. at 22 & n.4.

[204] JX-2 at 3.

"violations of securities rules and regulations" described in the 2019 Cause Examination report's noted exception.[205]

These statements, however, do not independently prove that Clearing's system violated FINRA rules. Like the 2018 Cautionary Action letter, the 2020 Cautionary Action Letter contains a disclaimer that FINRA's decision "not to take action" has no "evidentiary weight in any mediation, arbitration, or judicial proceeding."[206]

Sellers introduced expert testimony contextualizing the FINRA disclaimer. Sellers' experts Diles and Selman explained that a cautionary action letter is an "informal" means of concluding a FINRA examination and that the issuance lacks due process and the hallmarks of a formal legal proceeding.[207]

Diles opined that there is a general absence of legal process in the issuance of a cautionary action letter. Cautionary action letters are "generally not drafted, reviewed, or approved by FINRA attorneys, and the firm has no right to appeal them."[208] This makes the cautionary action letter process distinct from formal disciplinary actions, which Selman explains are governed by extensive procedural requirements including: sufficient allegations in FINRA's complaint; proper service on the member firm; rights to a hearing; rules governing discovery; and the right to

---

[205] JX-4 at 1.

[206] *Id.*

[207] JX-159 at 17; JX-163 at 9–10 (citing FINRA, *Sanction Guidelines – FAQ*).

[208] JX-163 at 9.

an appeal.[209] Informal actions involve none of this procedural rigor.[210] According to Selman, the process for cautionary action letters is scant by design: FINRA does not want its examination teams to turn into de facto rulemaking bodies.[211] It is thus unsurprising that FINRA staff repeatedly characterize cautionary action letters as addressing "minor" or "run of the mill" issues, and explicitly disclaim the letters' legal significance.[212]

Moreover, the Company's risk controls did not change between FINRA's 2017 Cycle Examination and FINRA's 2019 Cause Examination.[213] And FINRA found no relevant violations in the 2017 Cycle Examination.[214] This inconsistency amplifies the letters' lack of reliability.

Were this a pleading-stage decision, the 2019 Cause Examination report and the 2020 Cautionary Action Letter might give rise to a reasonable inference of a rule violation. And had Buyers' other evidence demonstrated a violation of FINRA rules, the 2019 Cause Examination report and the 2020 Cautionary Action Letter would lend support to that evidentiary finding. But standing alone, the documents lack the evidentiary value that Buyers place on them. They do not prove that Clearing was in breach of a FINRA rule on the Closing Date.

---

[209] JX-159 at 16–17.

[210] *Id.*

[211] Trial Tr. at 1087:12–23 (Selman).

[212] *See* JX-163 at 10; JX-159 at 16–17; JX-4 at 1.

[213] *See* Defs.' Post-Trial Opening Br. at 22 n.4

[214] *See* JX-35.

### 2. The Carveout

Any violation that Buyers seek to show is also carved out of the Legal-Compliance Representation. Section 3.12(a) of the Disclosure Schedule lists 43 matters to be excepted from the Legal-Compliance Representation.[215] Item 37 states that Clearing has "been the subject of the following examinations by FINRA or the SEC that are currently closed and, in each case, FINRA or the SEC, as the case may be, made certain findings in respect of [Clearing's] compliance with applicable Law."[216] Item 37 then lists 25 FINRA or SEC matters, including cycle examinations, cause examinations, and inquiries.[217]

One matter listed in Item 37 is the FINRA 2017 Cycle Examination and the resulting 2018 Cautionary Action Letter.[218] Taken together with the introductory language of Item 37 and the Legal-Compliance Representation, this means that the Legal-Compliance Representation does not apply to issues identified in the FINRA 2017 Cycle Examination or the resulting 2018 Cautionary Action Letter.

As discussed above, the Company's risk controls did not change between the FINRA's 2017 Cycle Examination and FINRA's 2019 Cause Examination.[219] Sellers' expert Diles explained that the issues identified in the 2019 Cause Examination are

---

[215] Of those, 36 are litigation, arbitration, or investigatory matters. JX-10 ("Disclosure Schedule") at 18–21. And Items 38 through 43 incorporate other documents by reference. *Id.* at 21.

[216] *Id.* at 20.

[217] *Id.* at 20, 21.

[218] *Id.* at 21.

[219] *See* Defs.' Post-Trial Opening Br. at 22 n.4.

the same as those identified in the 2017 Cycle Examination.[220] So Sellers argue that the regulatory vulnerabilities highlighted by the 2019 Cause Examination in the wake of the Reynolds Loss are carved out of the Legal-Compliance Representation because the same vulnerabilities were disclosed in the 2017 Cycle Examination.[221]

Buyers contend that items in the Disclosure Schedule are only excepted to the extent that they identify a violation of applicable Laws and Orders, and because the 2017 Cycle Examination does not find a violation, no violation is carved out of the representation.[222] Further, Buyers say there is no way to know what FINRA investigates during cycle examinations. So there is no way to know that FINRA examined the same vulnerabilities in 2017 and 2019.[223] Sellers respond that the facts disclosed in the Disclosure Schedule are carved out regardless of whether there was a "legal conclusion" of a violation.[224]

At least with respect to the circumstances on the Closing Date, Sellers have the better of the argument here. Delaware courts review disclosures for the realities that are revealed to parties rather than the specific terms used.[225] Parties are free

---

[220] JX-163 at 12–14.

[221] Pls.' Post-Trial Opening Br. at 51–52.

[222] Defs.' Post-Trial Opening Br. at 55.

[223] *Id.* at 51–52.

[224] Pls.' Post-Trial Answering Br. at 44–45; *see also id.* at 52.

[225] *DCV Hldgs., Inc. v. Conagra, Inc.*, 2005 WL 698133, at *7–8 (Del. Super. Ct. Mar. 24, 2005), *aff'd*, 889 A.2d 954 (Del. 2005).

to carve out "items or issues" from a disclosure schedule.[226] When a seller lists certain items or issues on a disclosure schedule, a "buyer will not be able to claim an inaccuracy that would give the buyer . . . a potential right to recover damages," even if the seller is unsure whether the listed items truly implicate the representation.[227] Furthermore, "even where material facts must be disclosed, negative inferences or characterizations of misconduct need not be articulated" by the seller.[228]

The 2017 Cycle Examination covered aspects of Clearing's risk systems at issue here. The examination report notes FINRA's concern regarding Clearing's procedures for escalating risk events, the Company's limitations in monitoring the activity of IBDs trading away, and the Company's documented processes for reviewing credit limits.[229] The report suggests, and Diles credibly testified,[230] that the vulnerabilities identified in the 2017 Cycle Examination report are the same as those that Buyers argue caused the Reynolds Loss.

Buyers also argue that, taken together, the note in Item 37 highlighting that the examinations were "closed" and the assurances given during diligence negated

[226] *See Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *80 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018).

[227] *See Akorn*, 2018 WL 4719347, at *78 (citing Lou R. Kling et al., 2 *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 10.02); *see also Level 4 Yoga, LLC v. CorePower Yoga, LLC*, 2022 WL 601862 (Del. Ch. Mar. 1, 2022), *aff'd*, 287 A.3d 226 (Del. 2022) (stating that representations and warranties "define[] the scope and nature of post-closing indemnification claims available to the buyer").

[228] *See DCV*, 2005 WL 698133, at *8 (citing *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997)).

[229] JX-35 at 6–7.

[230] *See* JX-163 at 12.

the carve-out.[231] But Item 37 highlights that the examinations were closed, not that underlying issues were resolved.[232] And Buyers disclaimed reliance on extra-contractual statements in the Merger Agreement.[233] The Carveout therefore applies to the violation that Buyers seek to prove.

## B.    Counterparty-Breach Representation

Buyers fare no better in proving an inaccuracy of the Counterparty-Breach Representation, which provides:

> [T]here exists no default or event of default or event, occurrence, condition or act, with respect to Company or its Subsidiaries or, to the Knowledge of Company, with respect to any other contracting party, which, with the giving of notice, the lapse of time or the happening of any other event or condition, would become a default or event of default under any Material Contract . . . .[234]

This representation states that the Company had no Knowledge that a counterparty to any of its Material Contracts was in default of the contract. The representation also means that the Company had no Knowledge of any circumstances that could cause a counterparty to a Material Contract to default. As to Sellers, the

---

[231] Defs.' Post-Trial Opening Br. at 55–56.

[232] Disclosure Schedule at 20.

[233] Merger Agr. §§ 4.10, 10.6; *see Pilot Air Freight, LLC v. Manna Freight Sys., Inc.*, 2020 WL 5588671, at *23 (Del. Ch. Sep. 18, 2020) (quoting *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1058 (Del. Ch. 2006)).

[234] Merger Agr. § 3.13(b)

Merger Agreement defines "Knowledge" as the knowledge of either Salas or Sime, after "due inquiry of direct reports."[235]

Buyers argue that the Counterparty-Breach Representation was inaccurate on the Closing Date because the Spartan Agreement was a "Material Contract" in default when the Merger closed.[236] According to Buyers, Spartan breached the Spartan Agreement by failing to comply with FINRA rules that required Spartan to maintain a reasonably designed supervisory system.[237]

Sellers respond that the Spartan Agreement was not a Material Contract. They advance other arguments—that Spartan was not in breach of the Spartan Agreement and that the Company had no Knowledge of any breach—but this decision does not reach them, because the Spartan Agreement is not a Material Contract.

Section 3.13(a) of the Merger Agreement defines "Material Contract" as follows: "Except as set forth in Section 3.13(a) of the Disclosure Schedule, neither Company nor any of its Subsidiaries is a party to or bound by, as of June 1, 2018, any of the following" eleven categories of contracts. The list of eleven categories is introduced by a parenthetical stating that "each contract, arrangement, commitment

---

[235] *Id.* § 10.10; Disclosure Schedule at 41. This means that the Company has Knowledge of a fact if Salas or Sime knew of the fact or would have known if they or their direct reports made a reasonable inquiry.

[236] Defs.' Post-Trial Opening Br. at 57.

[237] *Id.* at 59.

or understanding of the type described in this Section 3.13(a), *whether or not set forth in the Disclosure Schedule*, is referred to as a "Material Contract."[238]

The Spartan Agreement is not among the eleven types of agreements listed in Section 3.13(a), as Buyers concede.[239] Instead, Buyers argue that the definition of Material Contracts includes contracts on the Disclosure Schedule by operation of the "whether or not" clause italicized in the preceding paragraph. Buyers also argue that the Spartan Agreement is covered by the Disclosure Schedule because it is in the same form as the Fully Disclosed Clearing Agreement, which is mentioned in Section 3.13(a) of the Disclosure Schedule.[240]

Buyers are correct that the Spartan Agreement is covered by the Disclosure Schedule, but that fact does not help them, because the term "Material Contract" is defined to disregard the contracts on the Disclosure Schedule. The phrase "whether or not set forth in the Disclosure Schedule" in the definition of "Material Contract" does not mean that the definition "includes those contracts described in the disclosure schedule," as Buyers argue.[241] Rather, the definition describes "Material Contracts" as contracts falling within the categories listed in Section 3.13(a) of the Merger Agreement, and the "whether or not" clause commands that a reader disregard the

---

[238] Merger Agr. § 3.13(a) (emphasis added).

[239] *See* Defs.' Post-Trial Opening Br. at 57–58; Dkt. 285 at 14.

[240] Defs.' Post-Trial Opening Br. at 58; Disclosure Schedule at 24–25.

[241] Defs.' Post-Trial Opening Br. at 58; *see also* Defs.' Post-Trial Answering Br. at 53.

Disclosure Schedule for purposes of the definition.[242] Disregarding the Disclosure Schedule means that only those contracts listed in Section 3.13(a) of the Merger Agreement are Material Contracts.

For that reason, the Spartan Agreement is not a Material Contract under the Counterparty-Breach Representation.

## C. Causation

Even if either of the representations at issue were inaccurate, Buyers also failed to prove that the failure of either representation caused the Reynolds Loss.

According to the Merger Agreement, Buyers have a right to indemnification for damages "arising out of or resulting from" the failure of any representations and warranties.[243] This means that the failure of the representations and warranties must be the cause of the damages to Buyers.[244] The "arising out of or resulting from" language invokes Delaware's common law standard for causation, allowing damages for contractual breach only where the claimant proves a but-for relationship between

---

[242] *The Chicago Manual of Style* ¶ 5.254 (18th ed. 2024) ("The *or not* [in the phrase 'whether or not'] is necessary . . . when you mean to convey the idea 'regardless of whether'. . . .").

[243] Merger Agr. § 8.2(a).

[244] The phrase "arising out of or resulting from" is narrower than the phrase "relating to," which appears elsewhere in the Merger Agreement but not in the indemnification provision. *Compare* Merger Agr. § 8.2(a), *with id.* § 10.7 ("Each party . . . waives . . . any right such party may have to a trial by jury in respect of any proceeding directly or indirectly *arising out of or relating to* this Agreement[.]" (emphasis added)). *See Fla. Chem. Co., LLC v. Flotek Indus., Inc.*, 262 A.3d 1066, 1083 (Del. Ch. 2021).

the harm and the breach.[245]  Buyers thus must show that Sellers' breach was the "direct cause without which the [harm] would not have occurred."[246]

Sellers demonstrated that Clearing's failure to promptly respond to alerts generated by Clearing's risk-management system caused the Reynolds Loss. Clearing received ACT and DTCC alerts in the morning and afternoon of March 6 and became aware of Reynolds's trading position by 12:30 p.m. at the latest.[247] Clearing had the ability to stop Reynolds's trading at this time—Clearing could have hit the kill switch, and Clearing could have called the market center or Spartan's order management operator to revoke authorization.[248]

Clearing also could have bought Biopath stock to limit its exposure to the short position.[249] Sellers called expert Craig McCann to opine on this issue.  McCann is

---

[245] *Culver v. Bennett*, 588 A.2d 1094, 1097 (Del. 1991) (quoting *Chudnofsky v. Edwards*, 208 A.2d 516, 518 (Del. 1965)); *In re Dura Medic Hldgs., Inc. Consol. Litig.*, 333 A.3d 227, 255–56 (Del. Ch. 2025) (citing *eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678 (Del. Ch. Sept. 30, 2013)).  Buyers cite *Pacific Insurance Co. v. Liberty Mutual Insurance Co.*, 956 A.2d 1246 (Del. 2008), to argue that the harm only needs to have a "meaningful linkage" to the breach, but that standard is limited to insurance contracts.  *See* Defs.' Post-Trial Opening Br. at 43; *see, e.g.*, *Pacific Insurance*, 956 A.2d at 1256; *ACE Am. Ins. v. Guaranteed Rate, Inc.*, 305 A.3d 339, 347 (Del. 2023).

[246] *Culver*, 588 A.2d at 1097 (quoting *Chudnofsky*, 208 A.2d at 518).

[247] JX-22 at 7.

[248] *See* JX-8 at 1; Trial Tr. at 47:23–48:11, 74:7–19 (Tolla); *id.* at 666:10–14 (Abramczyk); *id.* at 746:22–749:9 (Salas); Sime Day 2 Dep. Tr. at 211:1–9.

[249] Salas Rule 30(b)(6) Dep. Tr. 106:9–107:14; 111:20–113:3.

highly qualified; he has worked as an economist and consultant for over 30 years and has held positions as a financial economist at the SEC.[250]

McCann testified that Clearing could have mitigated losses by reducing its exposure to Reynolds's short by acquiring Biopath stock. This was achievable given the high trading volume of Biopath on March 6.[251] McCann assumed that buying enough shares of Biopath to cover Reynolds's position would have taken no more than two hours.[252] McCann analyzed the cost to Clearing of closing Reynolds's position at four times on March 6: when the ACT alert was received; when the DTCC alert was received; when the National Securities Clearing Corporation issued a margin call to Clearing; and when Clearing contacted Spartan for the first time.[253] At each point, the cost to Clearing of purchasing Biopath stock within the two-hour window, less any realized proceeds from Reynolds's short position, would have resulted in losses of about $2.4 million, $2.8 million, $2.8 million, and $3 million, respectively.[254] According to McCann, if Clearing had taken action at any point on March 6, the loss to Clearing would have been $3.5 million or less.[255]

---

[250] JX-156, App. 1.

[251] Trial Tr. at 1101:15–1103:17 (McCann).

[252] *See* Trial Tr. at 1098:5–1099:2 (McCann)

[253] JX-231 at 2.

[254] Trial Tr. at 1097:17–24 (McCann); JX-156 at 12. These figures do not account for Spartan's ability to contribute to the loss, which would result in even smaller losses to Clearing. *See* JX-156 at 14.

[255] JX-156 at 12–14; JX-231 at 2. The losses to Clearing jumped by $14 million between March 6 and March 7, resulting in realized losses of $16.6 million ($15.2 million after Spartan's contribution). Trial Tr. at 1100:12–20 (McCann); JX-231 at 4;

Buyers do not provide a consistent narrative on why Clearing chose not to act during the developing short on March 6. Sellers provide an answer: professionals at Clearing decided not to. Clearing President Sime testified that he had the ability to shut down Reynolds's position on March 6.[256] He knew he had the authority to do so.[257] But Sime waited "to have a discussion with Garrabrants," his new supervisor, because closing the position had "implications to the parent company," Axos Financial.[258] In the meantime, Clearing "rel[ied] on Reynolds's commitments [and] allowed Reynolds and Spartan to keep the . . . position . . . open[.]"[259] Sime took no action on March 6 and called Garrabrants on March 7, which is when the losses to Clearing jumped substantially.[260] Garrabrants said he would need to think about whether to close the position and the two kept in contact over the course of the day.[261]

Garrabrants testified at a FINRA arbitration hearing that "Clearing [] has a way of closing everything . . . from a mechanical perspective," and could "take [an] offsetting position in the market."[262] So Garrabrants too could have shut down

---

JX-158 at 3. Buyers do not dispute McCann's findings. *See* Defs.' Post-Trial Opening Br. at 30 n.7.

[256] Sime Day 2 Dep. Tr. at 211:1–9; *see also id.* at 746:22–748:8, 749:2–19 (Salas).

[257] Sime Day 2 Dep. Tr. at 61:17–62:2.

[258] *Id.* at 58:5–60:17, 62:1–6.

[259] JX-252 at 25; *see* JX-235 at 3991:10–16, 3992:6–17.

[260] Sime Day 1 Dep. Tr. at 253:4–12; Sime Day 2 Dep. Tr. at 70:14–71:2; *see* JX-231 at 4.

[261] Sime Day 2 Dep. Tr. at 118:5–12.

[262] JX-235 at 3991:3–9.

Reynolds's trading and closed the position, but he chose not to take any action after he was told of Reynolds's position on March 7.[263]

Faced with evidence that Clearing's risk system generated the appropriate alerts that Clearing's personnel failed to act on, Buyers fault Sellers for failing to implement a clearer procedure for responding to risk. They say that if more comprehensive risk procedures were in place, Clearing's risk employees would have been alerted earlier, would have had more direction on how to respond, and would have reacted appropriately, eliminating or limiting the loss.[264] But this is a weak fallback. There were several discretionary calls made on March 6 and 7 that caused or contributed to the Reynolds Loss. Sime chose to rely on Reynolds's promise. Sime chose to consult Garrabrants before acting. Garrabrants chose not to act. And these decisions all followed Salas's removal from Clearing, which extinguished a familiar line of communication between Sime and senior leadership.[265] Buyers do not show that any change in procedure would have eliminated the discretionary calls that led to the Reynolds Loss.

This is consistent with Buyers' position in the FINRA arbitration against Reynolds that Clearing could have closed Reynolds's position "within five minutes" at

---

[263] Sime Day 2 Dep. Tr. at 118:5–19; *see also* Trial Tr. at 503:6–504:10 (Garrabrants). At trial, Garrabrants claimed that he decided not to act in part because Clearing could not hit the kill switch on Reynolds's trading. *Id.* But his testimony during Clearing's FINRA arbitration against Reynolds suggests otherwise. JX-235 at 3991:3–9.

[264] Defs.' Post-Trial Opening Br. at 46–47.

[265] Trial Tr. at 792:22–793:18, 802:6–11 (Salas).

any time during Reynolds's trading but chose to "rel[y] on Reynolds's misrepresentations by refraining from taking over and closing out the position itself."[266]

Ultimately, Buyers identified no missing controls that would have prevented the Loss. And Buyers could have prevented the Loss using the controls in place but affirmatively chose to not do so. Buyers fail to prove that any lack of procedures or controls caused the Reynolds Loss.

## III.    CONCLUSION

Judgment on Count I is entered in favor of Sellers. The parties are ordered to submit a form of order or competing forms of order implementing this decision within ten business days.

---

[266] JX-236 at 4205:7–12; JX-233 at 15; *see* JX-232 at 20; JX-236 at 4204:23–4205:16; Trial Tr. at 504:4–10 (Garrabrants).